

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-11-2005

# In Re: Comm Bank

Precedential or Non-Precedential: Precedential

Docket No. 03-4220

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re: Comm Bank " (2005). *2005 Decisions.* Paper 617.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/617

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
____

Nos. 03-4220, 03-4221, 03-4275, 03-4294, 03-4316,
03-4319, 03-4504, 03-4732, 03-4837, 04-4838, 03-4862,
04-1002, and 04-1039
_____

IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA
AND GUARANTY NATIONAL BANK OF TALLAHASSEE
SECOND MORTGAGE LOAN LITIGATION


Stephanie Spann; Leonila T. Nini; Eufronio Nini; John Hardt;
Robbin Verbeck; Stephanie Hafford; Charles B. Poindexter;
Maureen F. Poindexter; David B. Walker; Shundra R. Walker;
Jessie Dodd; James Beckius; Linda Whitehead; Lynell B.
Wingfield; Jario Ivan Sarrie; Beatriz Sarrie; Michelle K.
Morgan; Sharon Finnerty; Donald Appleton; Jeanette Appleton;
Edelman, Combs & Latturner, LLC;
Appellants in No. 03-4220

Walters, Bender, Strohbehn & Vaughan, P.C.,
Appellant in No. 03-4221

Scott C. Borison,
Appellant in No. 03-4294

Badeaux Class Member Opt-Outs,
Appellants in Nos. 03-4316 and 03-4838

Alabama Class Member Opt-Outs,
Appellants in No. 03-4319

Dickey, McCamey & Chilcote, P.C., David J. Armstrong, Esq.,
Douglas C. LaSota, Esq., Franklin R. Nix, Esq.,
Georgia Class Member Opt-Outs,
Appellants in Nos. 03-4275 and 03-4504

Ronald D. Gray; Ozy T. McDaniel; Jerline McDaniel; Tammy
and David Wasem; Richard and Margaret Harlin; Sylvester and
Patricia Watkins; Stephen D. Jensen; Joseph E. and Cynthia A.
Brownfield; Missouri Class Member Opt-Outs;
Illinois Class Member Opt-Outs,
Appellants in No. 03-4732

Michael Lane; Marcos Escalante; Cheryl White-Berry;
William P. Gorny; Rinaldo Swayne,
Appellants in No. 03-4837

Franklin R. Nix, Esq.; Georgia Class Member
Opt-Outs and Objectors,
Appellants in No. 03-4862

Marion Deloy Smith,
Appellant in No. 04-1002

John W. Sharbrough, III, Esq.; The Sharbrough Law Firm;
Alabama Class Member Opt-Outs
Appellants in No. 04-1039

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Nos. 03-cv-00425, 02-cv-01201, 02-cv-01563,
02-cv-01616, 02-cv-01999, 02-cv-02000)
District Judge: Honorable Gary L. Lancaster

_____

Argued February 17, 2005

Before: SLOVITER, AMBRO, and ALDISERT, <u>Circuit Judges</u>

(Filed: August 11, 2005)
_____

Daniel A. Edelman
Cathleen M. Combs   (Argued)

James O. Latturner
Edelman, Combs & Latturner
Chicago, IL 60603

> Attorneys for Appellants Stephanie Spann, <u>et al.</u>, in No. 03-4220

J. Michael Vaughan    (Argued)
David M. Skeens   (Argued)
R. Frederick Walters
Walters, Bender, Strohbehn & Vaughan
Kansas City, MO 64105

> Attorneys for Appellants Ronald D. Gray, <u>et al.</u>, in Nos. 03-4732, <u>et al.</u>

Franklin R. Nix     (Argued)
Law Offices of Franklin R. Nix
Atlanta, GA 30327

> Attorney for Appellants Georgia Member Opt-Outs & Objectors, <u>et al.</u>, in Nos. 03-4862, <u>et al.</u>

John W. Sharbrough, III
The Sharbrough Law Firm
Mobile, AL 36601

> Attorney for Appellants Alabama Class Member Opt-Outs, <u>et al.</u>, in Nos. 03-4319, <u>et al.</u>

Brian S. Wolfman    (Argued)
Charlotte Garden
Public Citizen Litigation Group
Washington, D.C.  20009

Scott C. Borison
Legg Law Firm
Frederick, MD 21703

> Attorneys for Appellants Badeaux Class Member Opt-

Outs, et al., in Nos. 03-4316, et al.

David G. Oberdick
Meyer, Unkovic & Scott
Pittsburgh, PA l5222

F. Douglas Ross
Odin Felman & Pittleman
Fairfax, VA 22031

     Attorneys for Appellee Community Bank of Northern
     Virginia, in Nos. 03-4220, et al.

Gary P. Hunt
Richard B. Tucker, III
Tucker Arensberg
Pittsburgh, PA l5222

     Attorneys for Appellee Guaranty National Bank of
     Tallahassee, in Nos. 03-4220, et al.

R. Bruce Carlson   (Argued)
Carlson Lynch
Sewickley, PA l5l43

Eric G. Calhoun
Lawson, Fields & Calhoun
Addison, TX 75001

A. Hoyt Rowell, III
Daniel Myers
Richardson, Patrick, Westbrook & Brickman
Mt. Pleasant, SC 29464

     Attorneys for Appellees Class Members in Nos. 03-4220,
     et al.

Thomas L. Allen   (Argued)
Roy W. Arnold
James C. Martin

Donna M. Doblick
Reed Smith
Pittsburgh, PA l5219

　　Attorneys for Appellee GMAC Residential Funding
　　Corporation, in Nos. 03-4220, et al.

Lawrence H. Richmond
Federal Deposit Insurance Corp.
Washington, D.C. 20434

　　Attorney for Intervenor Federal Deposit Insurance
　　Corporation in Nos. 03-4220, et al.

Table of Contents

I. Facts and Procedural History
　　A. The Alleged Illegal Lending Scheme
　　B. The Separate Class Actions
　　C. Consolidation of the Class Actions
　　D. The Opt-Out Solicitations
　　E. The Joint Motion to Invalidate Opt-Outs
　　F. The October 31, 2003 Conference Call
　　G. Appellants' Motion to Intervene
　　H. Appellants' Request for Discovery
　　I. The Fairness Hearing
　　J. The FDIC as Receiver for GNBT

II. Jurisdiction

III. Analysis
　　A. Class Certification
　　　　1. Certification Process Followed by the District Court
　　　　2. The Appropriateness of Class Certification
　　　　　　i. The Rule 23(a) Criteria
　　　　　　ii. The Rule 23(b)(3) Criteria
　　　　　　iii. Summary of Rule 23 Analysis
　　B. The District Court's October 14th and 17th Order

Invalidating Opt-Outs
      C.  The Motions to Intervene
      D.  Appellants' Request for Discovery
      E.  The Fairness of the Settlement
      F.   The Petition for Mandamus

IV.  Conclusion

_____

OPINION OF THE COURT

_____


SLOVITER, Circuit Judge.

This consolidated appeal arises from a "settlement only" class action in the District Court for the Western District of Pennsylvania that had consolidated six separate actions alleging an illegal home equity lending scheme against two banks and a company that acquired second mortgage loans from those banks in the secondary market. Plaintiffs are persons who borrowed from the two banks and signed second mortgages. On December 4, 2003, the District Court issued a Final Order approving a proposed settlement, which awarded $33 million to a class of 44,000 borrowers and $8.1 million in attorney fees. Appellees in this case are the settling parties. Appellants are a number of law firms and plaintiff class members who challenge the District Court's jurisdiction, nearly every aspect of the settlement process, and the fairness of the settlement itself.

## I.
## FACTS AND PROCEDURAL HISTORY

A. The Alleged Illegal Lending Scheme

This action alleges a pervasive predatory and illegal lending scheme affecting borrowers nationwide. The alleged mastermind of the scheme was the Shumway Organization ("Shumway"), a residential mortgage loan business operating out of Chantilly, Virginia. Through its several business forms, including EquityPlus Financial, Inc. ("Equity Plus"), Equity

6

Guaranty, LLC ("Equity Guaranty"), and various title companies, Shumway offered high-interest mortgage-backed loans to debt-laden homeowners.

Shumway was subject to fee caps and interest ceilings imposed by various state mortgage lending laws because it was a non-depository lender. State and nationally chartered banks, by contrast, are arguably not subject to the same restrictions. Plaintiffs allege that in an effort to circumvent the relevant state fee and interest ceilings, Shumway formed associations with several financially distressed banks, including two banks named as defendants, the Community Bank of Northern Virginia ("CBNV") (a state chartered bank) and the Guaranty National Bank of Tallahassee ("GNBT") (a nationally chartered bank).

CBNV and GNBT were allegedly paid for nothing more than permitting Shumway to disguise the origin of their loans, thus creating the appearance that fees and interest were paid solely to a depository institution. In reality, the overwhelming majority of fees and other charges associated with the loans were funneled through the two banks to Shumway via Equity Plus (in the case of loans purportedly made by CBNV) and Equity Guaranty (in the case of loans purportedly made by GNBT). Plaintiffs further allege that both CBNV and GNBT uniformly misrepresented the apportionment and distribution of settlement and title fees in their HUD-1 Settlement Statement forms, issued by the United States Department of Housing and Urban Development,[1] and that the stated fees in the HUD-1 Settlement Statements included illegal kickbacks to Shumway that did not reflect the value of any services actually performed.

GMAC Residential Funding Corporation ("RFC"), a division of GMAC Financial Services (part of the General Motors Corporation family), was alleged to be an essential co-conspirator in the Shumway scheme. In the late 1990s, RFC derived a substantial portion of its business by purchasing

---

[1] These misstatements were allegedly found in Sections 800 and 1100 of the banks' HUD-1 Settlement Statements.

"jumbo" mortgages (mortgages with loan balances above the purchasing authority of Freddie Mac and Fannie Mae) and especially High-LTV (loan-to-value) loans (loans where the amount financed represented up to 125% of the value of the securitized collateral) in the secondary market. By 1999, Shumway, acting through CBNV and GNBT, had become the largest producer of High-LTV loans in the country. Plaintiffs allege that RFC purchased a majority and perhaps all of the CBNV and GNBT originated loans, despite knowing that CBNV and GNBT were mere "straw-parties" used to funnel origination and title services fees to Shumway. The high origination fees on the purchased loans generated profit not only for Shumway but also for RFC; in most cases, fees were rolled into the principal balance of the loans, thereby generating substantial interest income.

In 2001, the United States Office of the Comptroller of the Currency conducted an investigation and audit of GNBT, resulting in the Comptroller's imposition of tight restrictions on the bank. Shortly thereafter, Shumway's relationship with RFC began to deteriorate. In a press release dated March 28, 2002, RFC announced that it was no longer willing to purchase high interest mortgage loans like the ones sold by Shumway. Without a purchaser for its loan product and without adequate reserves to maintain the loans in its own portfolio, the Shumway scheme essentially shut down by early 2003.

B. Separate Class Actions

The Community Bank class action began as the following six separate actions:

Kessler v. GMAC-RFC, No. 03-0425 (W.D. Pa.) was originally filed in the Court of Common Pleas of Allegheny County, Pennsylvania on February 26, 2003. Plaintiffs, a class of Pennsylvania borrowers, charged that RFC had assignee liability under Pennsylvania state law for the "bogus" loan origination and title service fees charged ostensibly by CBNV and GNBT. On March 26, 2003, RFC removed the case to the United States District Court for the Western District of Pennsylvania, asserting that Sections 85 and 86 of the National

8

Banking Act ("NBA"), 12 U.S.C. §§ 85-86, and Section 521 of the Depository Institutions Deregulation and Monetary Control Act ("DIDA"), 12 U.S.C. § 1831d, completely preempt any state law attempting to limit the amount of interest and fees a national or federally insured state-chartered bank could charge. Plaintiffs did not challenge removal.

Before the Kessler action was filed there were five other related actions pending in the same District Court premised on the same Shumway lending scheme. In Davis v. CBNV, No. 02-1201, initially filed on May 1, 2001, different plaintiffs sought to represent both a class of Pennsylvania borrowers and a class of nationwide borrowers. They asserted claims against CBNV, RFC, and Sovereign Bank (a purchaser of CBNV loans on the secondary market). On behalf of the Pennsylvania class, plaintiffs asserted that defendants violated Pennsylvania's mortgage lending usury statute, 41 Pa. Cons. Stat. §§ 101 et seq., and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1, et seq. On behalf of the nationwide class, the Davis plaintiffs asserted a violation of the fee split and disclosure provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(b). The case, originally filed in a Pennsylvania state court, was later removed by defendants to the federal court based on the existence of federal question jurisdiction.

In Sabo v. CBNV, No. 02-1563, filed on September 11, 2002, in the United States District Court for the Western District of Pennsylvania, plaintiffs commenced a putative nationwide class action suit against CBNV and RFC asserting claims under RESPA. In Ulrich v. GNBT, No. 02-1616, filed on September 19, 2002, in the same federal court, plaintiffs filed a similar putative nationwide class action suit asserting claims under RESPA, but this one named as defendants GNBT and RFC.

One month later, on November 16, 2002, plaintiffs filed Mathis v. GNBT, No. 02-1999, in the Court of Common Pleas of Allegheny County asserting various state law mortgage lending claims against GNBT and RFC, including violations of Pennsylvania's mortgage lending usury statute, 41 Pa. Cons.

9

Stat. §§ 101 et seq., and the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1, et seq. On November 19, 2002, Defendants removed the Mathis case to the federal court based on the doctrine of complete preemption. As in Kessler, these plaintiffs did not challenge removal.

Finally, on October 23, 2002, plaintiffs filed Picard v. CBNV, 02-2000, in the Court of Common Pleas of Allegheny County against CBNV, GNBT, and RFC. On November 19, 2002, Defendants removed the case to the federal court based on the doctrine of complete preemption. Plaintiffs initially filed a motion to remand, but on February 27, 2003, they filed an amended class action complaint asserting claims under RESPA and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, in addition to the various state law mortgage claims asserted in the original state complaint.

R. Bruce Carlson of the Pittsburgh, Pennsylvania law firm Specter, Specter, Evans, & Manogue, P.C. (now with Carlson Lynch), was the principal plaintiffs' class attorney in each of the above actions, including Kessler.

C. Consolidation of the Class Actions

On July 11, 2003, and prior to any discovery, the named plaintiffs in all six actions, together with defendants CBNV, GNBT and RFC, filed a joint motion for preliminary approval of a proposed nationwide class action settlement. Under the terms of the settlement, the maximum total payout to the approximately 44,000 member plaintiff class was $33 million, and the agreed-upon attorney fees were $8.1 million. The settlement payouts ranged from $250 to $925 per borrower depending on the borrower's residence and the date on which the loan was entered. In exchange, the borrowers were to release any and all state or federal claims that they might have relating to their second mortgage loan, including the right to use a violation of federal or state law as a defense to foreclosure or any other action. See, e.g.,15 U.S.C. § 1641(d)(1); 815 Ill. Comp. Stat. § 205/6; Kan. Stat. Ann. § 16a-5-202. The proposed settlement states that if more that .5% of the class members opt out of the settlement class, the settling defendants may terminate

10

the settlement.[2]

On July 17, 2003, less than a week after the motion was filed seeking approval of the settlement, the District Court, in an Order that in all material respects was a verbatim copy of the proposed Order offered by the settling parties in their July 11, 2003 joint motion, preliminarily approved the proposed settlement and consolidated all six actions listed above into the Kessler action. The case was thus consolidated at No. 03-cv-00425.

The plaintiff class was "conditionally certified" for settlement purposes only. The Order defined the class as:

> all persons . . . who (a) entered into a loan agreement with Community Bank of Northern Virginia . . . and/or Guaranty National Bank of Tallahassee . . .; (b) whose loan was secured by a second mortgage or deed of trust on property located in the United States; (c) whose loan was purchased by Residential Funding Corporation . . . and, (d) who [were] not . . . member[s] of the class certified in the action captioned Baxter v. Guaranty National Bank, et al., Case No 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

JA at 132.

Significantly, before issuing the July 17, 2003 Order, the District Court did not analyze whether the proposed class satisfied the prerequisites for a class action set forth in Fed. R. Civ. P. 23 (a), (b)(3), or (c)(2), as the Court explicitly reserved such analysis for a settlement hearing to be held on November

---

[2]Plaintiffs also agreed to dismiss Terry v. CBNV, 02-2534 GV (W.D. Tenn.), and Caton v. CBNV, CV 02 479286 (Court of Common Pleas Cuyahogo County, Ohio), two cases alleging the same fraudulent lending scheme as the current action. Plaintiffs in Terry and Caton were represented by the same counsel as plaintiffs in the consolidated action.

14, 2003.

The July 17, 2003 Order also provided for the mailing and publication of the class notice. The class notice directed by the District Court was verbatim the proposed class notice offered by the settling parties; it described the action as:

> A group of CBNV and GNB[T] borrowers, who are referred to as the "Named Plaintiffs" in this Notice, claim in the Litigation that CBNV and GNB[T] violated certain federal and state laws in connection with the fees and interest charged on second mortgage loans. These claims are asserted against the Defendants CBNV, GNB[T] and RFC.

JA 137. The notice also provided that all opt-outs must be received by the Settlement Administrator by October 1, 2003. Finally, class members were specifically instructed that they may discuss the settlement with their own attorneys.

D. The Opt-Out Solicitations

In September 2003, after the class notice was mailed, several law firms mailed letters to members of the plaintiff class urging them to contact the law firms regarding the above settlement, and in some cases urging them to opt out of the class. These law firms and the members of the class whom they solicited and who opted-out are the Appellants before us ("Appellants"). The Appellant law firms are as follows:

**Walters Bender, Strohbehn & Vaughan ("Walters")** , Nos. 03-4221, 03-4504, 03-4732, 04-1002 -

Walters has represented two plaintiff classes in class action suits related to the Shumway scheme. In June 2001, it filed a class action suit in Jackson County, Missouri against CBNV and assignees, alleging violation of the Missouri Second Mortgage Loans Act ("MSMLA"), Mo. Rev. Stat. §§ 408.231, et seq. The Circuit Court of Jackson County granted defendants' motion to dismiss for failure to state a claim on the ground that their MSMLA claim failed as a matter of law. The Missouri Court of Appeals affirmed. Avila v. Community Bank of N. Va., 143 S.N.3d 1 (Mo. Ct. App. 2003).

12

On April 3, 2003, Walters filed a putative class action in Clay County, Missouri against GNBT for violations of the MSMLA, asserting the same claim that it had asserted against CBNV. After GNBT removed that case to the United States District Court for the Western District of Missouri, that court held that plaintiffs' MSMLA claims are preempted under Sections 85 and 86 of the National Banking Act. See Phipps v. GNBT, No. 03-420-CV-W-GAF, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003). The Eighth Circuit affirmed. Phipps v. FDIC, __ F.3d __, 2005 WL 17736118 (8th Cir. 2005).

On September 18 and 19, 2003, the Walters firm mailed solicitation letters to borrowers in Missouri and Illinois urging them to object to the fairness of the settlement in the present action but did not urge them to opt out. In an affidavit to the District Court, Attorney J. Michael Vaughan of the Walters firm declared that prior to the September 18, 2003 letter, Walters was asked to advise and represent several Missouri borrowers (aside from those in either of the two Missouri class actions) who had obtained loans from GNBT. According to Walters, a total of nineteen Missouri borrowers filed opt-outs. Following the September 18 letter, thirty-five Missouri borrowers and eighty-nine Illinois borrowers filed objections to the settlement with the District Court.

**Attorney Franklin Nix and The Sharbrough Law Firm ("Nix")**, Nos. 03-4725, 03-4319, 03-4862, 04-1039 - On September 17, 2003, Attorney Nix mailed a solicitation letter to hundreds of Georgia class members setting forth defendants' potential liability under the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1601, et seq., and urging class members to opt-out or contact him regarding their settlement claims. Included in the solicitation was a Notice of Opt-Out form letter and a Representation & Fee Agreement contract. The Sharbrough Law Firm sent solicitations to Alabama class members.[3]

---

[3] The actual solicitation is not in the appendix.

13

**Legg Law Firm ("Legg")**, Nos.03-4294, 03-4316, 03-4837, 04-4838 -

Maryland and Florida borrowers received solicitation letters from Legg urging class members to contact the firm to discuss the settlement. The original letter misstated the opt-out date as October 15, 2003. A subsequent letter corrected the mistake. In a Declaration to the District Court, Attorney Scott C. Borison of the Legg firm declared that prior to sending out the solicitation letters he had existing clients who had claims against CBNV. Borison also declared that after he sent the solicitation letters approximately 100 people asked him to assess their cases. After he reviewed their documents, he recommended that only forty-four class members (collectively known as the Badeaux opt-outs) opt out of the settlement and retain Borison as their counsel against CBNV.

**Edelman, Combs & Latturner, LLC ("Edelman")**, Nos. 03-4220 -

Edelman sent solicitation letters to borrowers in Illinois urging class members to contact them to assess their claims, and to opt-out of the settlement. Edelman claims to have received fifteen responses to its solicitations; thirteen of which it believed had merit. On October 3, 2003, Edelman filed a suit on behalf of these opt-outs in the Northern District of Illinois in a case captioned Spann v. CBNV, No. 03 C 7022.

By the October 1, 2003 deadline, 435 people had opted out of the class action settlement. Stephen Tilghman, the settlement administrator, declared that 419 of those opt-outs were a result of the solicitation letters by the above law firms. Of those 419 opt-outs, 326 were submitted by Georgia class members on opt-out forms provided by Nix. The 435 total opt-outs amounted to nearly 1% of the total class; nearly double the .5% trigger that would allow defendants to terminate the settlement.

E. The Joint Motion to Invalidate Opt Outs

Fearing that their settlement was in jeopardy, on October 6, 2003, class counsel and defendants' counsel (the "settling parties") filed a Joint Motion to Invalidate Solicited Opt-Outs

and for Court Approved Notice to Address False, Misleading and Deceptive Solicitations of Opt-Outs. The Joint Motion asserted that the above law firms had improperly solicited and misled class members, thus inducing them to opt out of the class settlement. The settling parties asked the Court to invalidate all prior opt-out decisions, send a curative notice to those class members who had opted out, and prevent any communication between Appellants and class members, except for written communications pre-approved by the Court. The settling parties' brief in support of the Joint Motion, as expected, targeted the Nix's solicitations.

The District Court granted the settling parties' joint motion on October 14, 2003. It did so without conducting a hearing, setting a briefing schedule or otherwise allowing Appellants any practical opportunity to be heard. The Order the District Court entered on October 14, 2003 followed verbatim the Order proposed by the settling parties, except that the District Court extended the second opt-out deadline from the October 24, 2003 date proposed by the settling parties, to November 3, 2003.[4]

On October 15, 2003, one day after entry of the Order invalidating the opt-outs, Appellants Walters, Nix, and Edelman filed emergency motions asking the District Court to stay its October 14 Order and to reconsider its decision. On October 16, Legg submitted a proposed communication to its opt-out clients to the District Court for approval.

On October 17, 2003, two days after the motion to reconsider was filed, the District Court denied the motions. The brief Order stated in full:

> Before the court are several motions to reconsider
> our Order of October 14, 2003 [doc. Nos. 30, 31,

---

[4] We note that the second opt-out period ended only two weeks after the Joint Motion was granted, leaving class members little time to file their second opt-outs.

15

32, and 33]. The motions are DENIED.
The letters mailed by each of the firms named in the October 14, 2003 Order of Court to plaintiff class members in this case were direct solicitations for prospective clients whom they knew to be represented by another lawyer. If there is not a rule of professional conduct that prohibits such activity in the jurisdictions where these lawyers practice, there should be. See generally, Georgine v. Amchem Products, 160 F.R.D. 478[, 495 n.26] (E.D. Pa. 1995). . . .

JA at 145.

The District Court apparently treated the Legg proposed communication as a motion to reconsider, and denied it in the same October 17, 2003 Order. The Court thereafter did not specifically address why it would not permit Legg to send out its proposed communications.

Pursuant to the October 14, 2003 Order, "curative notices" were sent to all class members who had opted out during the first opt-out period. These notices, which were tailored to the communications sent by each Appellant law firm, were verbatim copies of the proposed curative notices submitted by the settling parties. Each notice stated that the Court has concluded that the "[Appellant law firms' solicitations] contained a number of misleading and inaccurate statements" and therefore that the "exclusion requests received after the date of the letter are all void." See, e.g., App. at 2062. The curative notices also contained a number of detailed bases for the finding that the Appellant law firms' solicitations were misleading. Finally, the curative notices urged the recipients to reconsider their decisions to opt out. The notice made clear that failure to submit a second opt-out by November 3, 2003 would waive the class member's rights to opt out of the settlement.

The provision of the October 14, 2003 Order that precluded the Appellant law firms from communicating with any members of the class, except for written communications pre-

16

approved by the District Court, included a bar on communication with class members who had retained the Appellant law firms either before or during the first opt-out period. Several Appellants declared in affidavits provided thereafter that when their retained clients attempted to contact them for advice or for explanation of the curative notice, they were compelled to reject their clients' attempts at communication. See, e.g. JA 2056-57 (declaration of Borison). In the particular cases of Walters and Edelman, the October 14, 2003 Order prevented them from communicating with class members whom they represented in pending litigation. See Phipps v. GNBT, No. 03-420-CV-W-GAF (W.D. Mo.); Spann, et al. v. CNBV, No. 03 C 7022 (N.D. Ill).

On October 21, 2003, Walters sought permission to submit a proposed communication in camera to avoid waiver of the attorney-client privilege. On October 22, 2003, the District Court entered an Order granting Walters' request to submit the proposed communication to the Court but directed that it also must be served on all counsel. Thereafter, Walters did not submit the proposed communication for the Court's approval.

All Appellant law firms except Walters complied with the bar on communications. Walters sent letters by overnight delivery to the nineteen Missouri opt-outs on October 30, 2003, and informed the District Court of this action on October 31, 2003. There was no sanction by the Court. The record does not show whether the letters Walters sent were the same as the proposed communication referred to above.

By November 3, 2003, the end of the second opt-out period, only 110 class members had opted-out a second time.

F. The October 31, 2003 Conference Call

On October 31, 2003, the District Court sua sponte convened a conference call among plaintiffs' class counsel, counsel for RFC, CBNV, GNBT, and the Court (but not including Appellants' counsel) to address the issue of whether the District Court had subject matter jurisdiction over the settlement proceedings.

17

The Kessler action had been removed to federal court on the ground that Sections 85 and 86 of the NBA and Section 521 of the DIDA completely preempted Pennsylvania state law usury claims. See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1 (2003). Under settled precedent, where there is complete preemption of a state law claim the result is "to convert complaints purportedly based on the preempted state law into complaints stating federal claims from their inception." Krispin v. May Dep't Stores Co., 218 F.3d 919, 922 (8th Cir. 2000).

The District Court informed the parties to the phone conversation that he had examined the original complaint in the Kessler action and concluded that plaintiffs had not asserted any state law usury claims. Rather, the only claims asserted were state law charges of "bogus" loan origination and title services fees, which under the Court's reasoning do not constitute interest and therefore are not preempted by federal statute. See, e.g., Hancock v. Bank of Am., 272 F. Supp. 2d 608, 610 (W.D. Ky. 2003) (noting that preemptive force of NBA §§ 85 and 86 does not exist with respect to claims based on unlawful assessment of non-interest service fee). In the phone conference the District Court stated:

> I have serious reservations as to whether or not I have subject matter jurisdiction over that claim, for the simple reason is this. My understanding of that bank act is that it regulates the amount of interest that a bank can charge for a mortgage loan. However, the claims here have nothing to do with interest. They are with these bogus filing fees. Those claims are not interest. And the cases I have reviewed said that the National Banking Act does not preempt those types of claims.

App. at 127.

Counsel for RFC responded that the "underlying claims in the State court were attacking the fees and interests and, therefore, [they] would give rise to subject matter jurisdiction under the complete preemption doctrine." App 127. When the Court rejected this argument, counsel then suggested that perhaps the Court had jurisdiction because the Kessler action

18

had been consolidated with several other actions which explicitly asserted federal claims. The Court responded that "the Court of Appeals from [sic] the Third Circuit has said pretty clearly that simply consolidating claims where there's proper federal jurisdiction with one that there is not does not get us there." App. 128; see, e.g., Brown v. Francis, 75 F.3d 860, 866 (3d Cir. 1996).

Faced with this perceived jurisdictional hurdle, the District Court then suggested to the parties that, as he saw it, the jurisdictional problem in the Kessler action could be remedied if plaintiffs' counsel filed an amended complaint under Fed. R. Civ. P. 15(c)(2), which "[could] be deemed related back to [the] original filing." App. at 128. In other words, the District Court suggested to the settling parties that plaintiffs file an amended complaint explicitly asserting a federal claim.

On November 10, 2003, just four days prior to the date scheduled for the fairness hearing, plaintiffs' class counsel heeded the District Court's advice and filed a Consolidated Amended Class Action Complaint asserting violations of RESPA at Counts I and II, and violations of RICO at Count III.

G.   Appellants' Motion to Intervene

Meanwhile, on October 1, 2003, certain Missouri and Illinois objectors represented by Appellant Walters had moved to intervene as a matter of right under Fed. R. Civ. P. 24(a)(2) and permissively under Fed. R. Civ. P. 24(b) for the purpose of seeking a six-month stay of the fairness hearing in order to conduct discovery into the adequacy and fairness of the underlying settlement. Appellant Walters also filed a Complaint in Intervention against CBNV, GNBT, and RFC asserting claims under HOEPA and TILA on behalf of the nationwide class, claims under MSMLA for the subclass of Missouri borrowers, and claims under the Illinois Interest Act for the subclass of Illinois borrowers.

The settling parties filed an opposition to the intervention on October 17, 2003. On October 21, 2003, the District Court denied the motion to intervene under Fed. R. Civ. P. 24(a) and

19

24(b) "without prejudice to its renewal following the submission of evidence from objectors at the Fairness Hearing." JA at 146-47. At the November 14, 2003 fairness hearing, the proposed intervenors orally renewed their motion to intervene and on December 3, 2003 they renewed that motion by filing a written motion to intervene. The District Court denied the renewed motion on the same day without explanation.[5]

### H. Appellants' Request for Discovery

In early November 2003, Appellant Walters served several deposition requests directed to some of the named plaintiffs and class counsel and subpoenaed the same parties to appear at the November 14, 2003 fairness hearing in an effort to establish the inadequacy of the settlement. On November 5 and then on November 10, 2003, the settling parties moved to quash the deposition requests and witness subpoenas, and requested that the District Court order that no other subpoenas be allowed nor discovery taken. On November 10, 2003 (the day the second motion was filed), the District Court granted these motions in an Order which, with the exception of a redacted portion regarding attorney sanctions, was verbatim the Order proposed by the settling parties. Specifically, the November 10 Order provided that "[t]he Missouri and Illinois Objectors, their attorneys, and any person acting on their behalf [could] not issue any further discovery requests or subpoenas" without prior approval of the

---

[5] The appeal by the proposed intervenors from the District Court's October 21 Order, docketed at No. 03-4504 which remains pending, is dismissed because the Order was not a final adjudication of the issues involving intervention and was therefore not appealable. See Carlough v. Amchem Prods., Inc., 5 F.3d 707, 712-14 (3d Cir. 1993).

The renewed motion to intervene was filed after the appeal was taken from the Final Order in this matter. We now have jurisdiction to address the issue of whether the District Court's denial of intervention was proper. Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370, 380 (1987).

Court; that Appellants could not present testimony of any witness at the final fairness hearing without prior approval of the Court; and that all prior subpoenas purporting to require a witness or party to attend and testify at the final fairness hearing were thereby void. JA 150-51.

I. The Fairness Hearing

On October 1, 2003, the original deadline for opt-outs, several Appellants filed Notices of Objections to the Settlement Agreement claiming that the conditionally certified class failed to meet the requirements of Fed. R. Civ. P. 23 and that the settlement was neither fair nor reasonable. On November 14, Appellant Walters filed a supplement to and amendment of its objections to the settlement agreement, arguing, inter alia, that the average RESPA claim being released was worth $14,042.95 and that the average HOEPA claim being released was worth $20,108.76. On the same day, it submitted an "Offer of Proof," detailing the Missouri and Illinois objections to the proposed settlement. In a declaration dated November 12, Attorney Nix claimed that the settlement was releasing "over a BILLION DOLLARS of strict liability Truth-in-Lending damages owed to 44,000 Class members, who are all victims of predatory lending subject to the federal Home Ownership and Equity Protection Act ("HOEPA") (15 U.S.C. §1639, et seq.)." JA at 1909. Attached to the Nix declaration was a spreadsheet detailing his estimated TILA damages calculations for the class.

The District Court held a fairness hearing on November 14, 2003, and heard oral arguments from both class counsel and objectors. Immediately prior to the fairness hearing, there was a discussion in the District Court's chambers between class counsel and the Court. Appellants' counsel were not invited. The following colloquy at that chambers meeting is in the record:

> Carlson [counsel for settling class]: We are in the process of preparing proposed findings of fact and conclusions of law which we would submit to Your Honor with the Court's approval.

Court:      Yes.

Carlson:    That's the primary —

Court:      I have to write an opinion anyway —

Carlson:    Right.

Court:      —on this.  But you want to submit some findings of fact that I would adopt basically?

Carlson:    That would be our preference, Your Honor.

Court:      Have you prepared a final order?

Carlson:    We included a final order in our motion for preliminary approval.

Court:      Okay.  Are you satisfied it will meet everything we need even after today?

Carlson:    With the addition of the findings and conclusions that we contemplate, we believe that it's perfectly adequate.

Court:      How long do you need to have these conclusions and findings submitted?

***

Court:      We will go through the hearing, and you have a week to ten days to get the rest of this stuff in.

Carlson:    I think we can have it in by next Friday, Your Honor.

Court:      Okay.  Then I will, assuming they

are fine, I will go ahead and adopt them and put my reasons for approving the settlement in a written memorandum.

JA 1973-74, 1976.

The District Court did indeed approve the proposed settlement in a Final Order dated December 4, 2003. Filed with the Order was a Memorandum prepared by the District Court and Findings of Fact and Conclusions of Law prepared by the settling parties. Although the Findings of Fact and Conclusions of Law were not signed by the District Court, the Court's memorandum stated in a footnote that "[u]pon independent review of the record in this case, the court finds that the proposed findings and conclusions are fully supported by the record adopted by the court and incorporated into this memorandum by reference as if fully set forth." JA at 176.

J. The FDIC as Receiver for GNBT

On March 12, 2004, after the events set forth above, the Comptroller of the Currency declared GNBT to be unsafe and unsound, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. The FDIC, on March 29, 2004, asked to be substituted for GNBT as the true party in interest. This court gave the FDIC leave to intervene in this appeal and granted the FDIC's request for a ninety day stay from the date of its appointment as receiver. See 12 U.S.C. § 1821(d)(12)(A)(ii).[6]

---

[6] Appellants contend that FDIC should not be substituted for GNBT as the true party in interest because GNBT was never a named defendant in the Kessler action, No 03-0425. They are correct that the District Court's July 17, 2003 consolidation of the five other class actions, where GNBT was a named defendant, into the Kessler action does not make GNBT a party to the consolidated action. See Cella v. Togum Constructeur Ensemleier En Industrie Alimientaire, 173 F.3d 909, 912 (3d Cir. 1999) (noting that case consolidation "does not merge the suits into a single cause, or

# II.
## JURISDICTION

We must consider at the outset Appellants' argument that the District Court lacked subject matter jurisdiction over the original <u>Kessler</u> action, and that as a result we must vacate the settlement and direct remand to the Pennsylvania state court.

As the District Court recognized, there was no diversity in the original <u>Kessler</u> action and no federal question was pled on the face of the complaint. It is well settled that "[o]nly state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987). Under the well-pleaded complaint rule, there can be no removal on the basis of a federal question unless the federal law under which the claim arises is a direct and essential element of the plaintiff's case. <u>See</u> <u>Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.</u>, 463 U.S. 1, 10-12 (1983); <u>Louisville & Nashville R.R. Co. v. Mottley</u>, 211 U.S. 149 (1908). However, the complete preemption doctrine is an "independent corollary" to the well-pleaded complaint rule. <u>Caterpillar Inc.</u>, 482 U.S. at 393. In <u>Caterpillar</u>, the Supreme Court stated:

> On occasion, the Court has concluded that the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule. . . . Once an area of state law

---

change the rights of the parties, <u>or make those who are parties in one suit parties in another</u>") (emphasis added) (internal citations and quotations omitted). However, on November 10, 2003, plaintiffs' class counsel filed an amended consolidated complaint listing GNBT as a defendant. Thus, pursuant to 16 U.S.C. § 1821(d)(2), the FDIC succeeded to all "rights, titles, powers, and privileges of [GNBT,] the insured depository institution," and we grant the FDIC's motion to be substituted for GNBT as the true party in interest.

has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.

Id. (internal quotations and citations omitted); see also In re U.S. Healthcare, Inc., 193 F.3d 151, 161 (3d Cir. 1999); Schmeling v. NORDAM, 97 F.3d 1336, 1342 (10th Cir. 1996) (stating that complete preemption is "not as a crude measure of the breadth of the preemption (in the ordinary sense) of a state law by a federal law, but rather as a description of the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal").

RFC removed the Kessler action on the ground that plaintiffs' charges of "blatantly fraudulent" origination and title services fees,[7] are completely preempted by §§ 85 and 86 of the

---

[7] The Kessler complaint charged, in essence:

Count I - Breach of Contract: the fraudulent origination fees resulted in a contractual breach of the loan agreement

Count II - Breach of Contract: the fraudulent fees for title services resulted in a contractual breach of the loan agreements

Count III - Contract Void: that the "subterfuge was to circumvent the Pennsylvania Secondary Mortgage Loan Act (and other analogous state laws)," making the agreements void against public policy. Plaintiffs do not allege a violation of the Pennsylvania Secondary Mortgage Loan Act itself

Count IV - Conversion- that the payment of the above mentioned fees "deprived Plaintiffs and the Class of a right in property" resulting in a common law conversion claim

Count V - Unjust Enrichment - that RFC, the purchaser of the

NBA and by § 521 of the DIDA.

In <u>Beneficial Nat'l Bank v. Anderson</u>, 539 U.S. 1 (2003), the Supreme Court definitively held that §§ 85[8] and 86[9] of the

loans, was unjustly enriched by knowingly accepting and retaining the monetary benefits of the unlawful conduct

Count VI - Money Had and Received - that the fraudulent conduct prohibited RFC in equity and good conscience from keeping these ill-gotten gains of the loans

Count VII - Fraud - that the scheme to extract unlawful settlement fees was predicated on false representations upon which the plaintiffs and class members presumptively relied

Count VIII - Pennsylvania's Unfair Trade Practices and Consumer Protection Law - that the conduct violated state consumer protection statute

Count IX - Conspiracy - the conduct constituted a common law conspiracy.

App. at 622-33.

[8] Section 85 provides:

Rate of interest on loans, discounts and purchase

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under state laws, the rate so limited shall be allowed for associations organized or existing in any such State under

this chapter.  When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run.  The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located.  And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.

12 U.S.C. § 85.

[9] Section 86 provides:

Usurious interest; penalty for taking; limitations

The taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In the case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: Provided, That such action is commenced within two years from the time the usurious transaction occurred.

NBA completely preempt state law usury claims against national banks. The Court stated:

> Because §§ 85 and 86 provide the exclusive cause of action for [usury] . . . claims, there is, in short, no such thing as a state-law claim of usury against a national bank. Even though the complaint makes no mention of federal law, it unquestionably and unambiguously claims that petitioners violate usury laws. This cause of action against national banks only arises under federal law and could, therefore, be removed under § 1441.

539 U.S. at 11. In other words, a claim of usury against a national bank such as GNBT purporting to be grounded in state law is in reality a federal claim.

Likewise, § 521 of DIDA[10] completely preempts any state law attempting to limit the amount of interest and fees a federally insured-state chartered bank can charge. See

12 U.S.C. § 86.

[10] Section 521 provides:

(a) Interest rates
In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, . . . with respect to interests rates, . . . such State bank[s] . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank . . . is located or at the rate allowed by the laws of the State, territory, or district where the bank is located whichever may be greater.

12 U.S.C. § 1831d(a) (emphasis added).

28

Greenwood Trust Co. v. Mass., 971 F.2d 818, 826-28 (1st Cir. 1992). Not only does § 521 contains an express preemption clause, "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section," 12 U.S.C. § 1831d(a), but the statute also incorporates verbatim the language of § 85 of the NBA. When Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts ordinarily should be interpreted the same way. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383-84 (1992); Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 144-45 (1990); Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756 (1979).

In light of this precedent, we must examine the Kessler complaint to determine if it alleged state law claims of unlawful interest by a nationally or state chartered bank. We can set aside the issue raised by the District Court during the October 31, 2003 conference call (whether the fraudulent origination and title service fees alleged by plaintiffs constitute "interest" under the NBA or the DIDA) and focus instead on two more substantial, and ultimately determinative, issues. First, the Kessler complaint asserted no claims against a national or state chartered federally insured bank. Rather, only RFC (and not CBNV or GNBT) was named as a defendant in the original action. See, e.g., Colorado ex rel. Salzar v. Ace Cash Express, Inc., 188 F. Supp. 2d 1282, 1285 (D. Colo. 2002) ("The Complaint strictly is about a non-bank's violation of state law. It alleges no claims against a national bank under the NBA."). Second, the complaint asserted no usury claims against any party under Pennsylvania state law.

Sections 85 and 86 of the NBA and Section 521 of the DIDA apply only to national and state chartered banks, not to non-bank purchasers of second mortgage loans such as RFC. See, e.g., Weiner v. Bank of King of Prussia, 358 F. Supp. 684, 687 (E. D. Pa. 1973) (stating that NBA "regulates national banks and only national banks, which can be identified by the word 'national' in their name"). Several courts have explored the issue of removal in cases involving complaints very similar to that found in the present case and found removal improper.

29

In Flowers v. EZPawn Oklahoma, Inc., 307 F. Supp. 2d 1191 (N.D. Okla. 2004), plaintiffs brought Oklahoma state-law claims of usury and fraud against two defendants, alleging that those defendants had "[entered] into a 'sham' relationship with County Bank of Rehoboth Beach, Delaware . . . for the purpose of claiming federal preemption and evading state usury, fraud and consumer protection laws." Id. at 1196. County Bank itself was not named as a defendant in the state court action. The district court denied removal, stating that "[n]o claims have been brought against County Bank in this lawsuit. The state action claims are asserted against EZPawn and EZCorp, neither of which is a state-chartered, federally insured (or national) bank." Id. at 1204.

Likewise, in Colorado v. Ace Cash Express, Inc., 188 F. Supp. 2d 1282 (D. Colo. 2002), plaintiffs asserted state law claims against a non-bank check cashing business, which offered ancillary loans made by a national bank. The national bank was not named as a defendant in the complaint. The district court denied defendants' attempt at removal, stating that "in this case Defendant and the national bank are separate entities and their relationship does not give rise to complete preemption under the NBA. . . . The Complaint strictly is about a non-bank's violations of state law. It alleges no claims against a national bank under the NBA." Id. at 1285.

The facts in the Kessler action are distinguishable from Krispin v. May Dep't Stores Co., 218 F.3d 919 (8th Cir. 2000), where the holders of a department store's credit cards brought a class action alleging violation of Missouri state usury laws. Although there were no claims against a national or state-chartered bank, the loans were issued by a national bank, which was a wholly owned subsidiary of the department store. Therefore, the Eighth Circuit held that removal was proper, noting that although the credit agreement existed between customers and the department store, it was the national bank that "process[ed] and servic[ed] customer accounts, and set[] terms [such] as interest and late fees." Id. at 924.

Krispin is inapplicable to Kessler where, despite the

30

provision in the loan agreement that loans were made through a national or state-chartered bank (CBNV or GNBT), the loans were, in fact, made and serviced by Shumway, a non-depository institution. These loans were then bought by RFC (the named defendant), also a non-bank, in the secondary market. Because RFC, CBNV, and GNBT are entirely separate entities, plaintiffs' state law claims against RFC could not be preempted by the NBA or by the DIDA.

Moreover, the original Kessler complaint failed to plead any state law usury claims, alleging only a series of other state law claims that are not preempted by the NBA, DIDA, or any other federal law. See Appendix of Exhibits, Ex. 1 at 33 (Kessler complaint) ("The claim that Plaintiff and the Class are asserting in this Count [Count III] is predicated upon state common law and this claim is expressly not seeking to assert a private right of action under the Pennsylvania Secondary Mortgage Loan Act or any other statutory law."). It follows that removal was improper.

This does not end our inquiry. The Supreme Court has held that

> where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court.

Grubbs v. Gen. Elec. Credit Corp., 405 U.S. 699, 702 (1972); see also Knop v. McMahan, 872 F.2d 1132, 1138 (3d Cir. 1989).

The same result may obtain where a case has been improperly removed but the original complaint is subsequently amended to state a well-pleaded federal question. See Pegram v. Herdrich, 530 U.S. 211, 215 n.2 (2000) (stating that plaintiff's amended complaint "alleged ERISA violations, over which the federal courts have jurisdiction, and we therefore have jurisdiction regardless of the correctness of the removal");

31

Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1280 (11th Cir. 2005) (same); Barbara v. N.Y. Stock Exch., Inc., 99 F.3d 49, 56 (2d Cir. 1996) ("[I]f a district court erroneously exercises removal jurisdiction . . ., and the plaintiff voluntarily amends the complaint to allege federal claims, we will not remand for want of jurisdiction."); Kidd v. Southwest Airlines, Co., 891 F.2d 540, 547 (5th Cir. 1990) (same); Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 185 (7th Cir. 1984) (holding that although plaintiff's original complaint was not removable, his decision to "throw in the towel" and amend his complaint to state "an unmistakable federal cause of action" conferred original jurisdiction on the federal court").[11]

---

[11] We recognize that the rule employed in Pegram and the other above cited cases is only analogous to our present issue. Indeed, in each of the cited cases, the parties were adverse, and plaintiffs, at some point, actively challenged removal. As reasoned by Judge Posner in Bernstein:

> If [Bernstein] was convinced that the original action was not removable[,] he could have stuck by his guns and we would have vindicated his position on appeal. But once he decided to take advantage of his involuntary presence in federal court to add a federal claim to his complaint[,] he was bound to remain there. Otherwise[,] he would be in a position where if he won his case on the merits in federal court[,] he could claim to have raised the federal question in his amended complaint voluntarily, and if he lost he could claim to have raised it involuntarily and to be entitled to start over in state court.

738 F.2d at 185. Arguably, there is tension between the rule of Grubbs and Pegram, and the general doctrine of Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989), and Grupo Dataflux v. Atlas Global Group, 541 U.S. 567 (2004), that "the jurisdiction of the Court depends upon the state of things at the time of the action brought," id. at 570. We believe that Grubbs and Pegram are controlling here.

32

The amended complaint submitted by the settling parties on November 10, 2004, not only added CBNV and GNBT as defendants, but also explicitly asserted federal claims, specifically, violations of RESPA at Counts I and II, and RICO at Count III. We are persuaded that under the Supreme Court's holdings in Grubbs and Pegram, the District Court properly acquired subject matter jurisdiction by virtue of the amended complaint.[12]

## II.
## ANALYSIS

Appellants challenge nearly every aspect of the proceedings in the District Court. We examine each challenge in turn.

### A.
### Class Certification

---

[12] We note that the mere act of consolidating the five related cases (Davis, Sabo, Ulrich, Mathis, and Picard) into the Kessler action on July 17, 2003, could not, by itself, cure the original jurisdictional defect in Kessler. As stated by the Supreme Court, "consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496-97 (1933) (interpreting the predecessor rule to Rule 42(a); see also Newfound Management Corp. v. Lewis, 131 F.3d 108, 116 (3d Cir. 1997) (stating that "Johnson remains the 'authoritative' statement on the law of consolidation"). Thus, we held in Cella v. Togum Constructeur Ensemleier En Industrie Alimentaire, 173 F.3d 909, 912 (3d Cir. 1999), that "while a consolidation order may result in a single unit of litigation, such an order does not create a single case for jurisdiction purposes." See also Bradgate Assoc., Inc. v. Fellows, Read & Assoc., Inc., 999 F.2d 745, 750 (3d Cir. 1993). In other words, each consolidated case must support an independent basis for subject matter jurisdiction.

An appellate court reviews the initial certification of the class and the decision whether to approve the proposed settlement for abuse of discretion. In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 299 (3d Cir. 1998); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 782 (3d Cir. 1995) ("G.M. Trucks"); Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).

We must decide whether a district court's failure to follow the procedures required before approving a settlement-only class action was an abuse of discretion.

As we stated above, on July 17, 2003, the District Court, acting on the settling parties' motion, consolidated five separate class actions into the Kessler action, conditionally certified the class for "settlement purposes" only, and preliminarily approved the settling parties' proposed settlement. JA at 132. The Order explicitly left the issue of whether "the Class meets the requirements for final certification under Fed. R. Civ. P. 23(a), (b)(3), (c)(2) and the United States Constitution" until the final fairness hearing. JA at 133.

The settlement class action device offers defendants the opportunity to engage in settlement negotiations without conceding any of the arguments they may have against class certification. See G.M. Trucks, 55 F.3d at 786. Often, as in this case, the parties never intend to litigate the claims; rather, from the time the plaintiffs file the complaint, the goal on both sides is to reach a nationwide settlement. See, e.g., Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 601-02 (1997) (discussing case where complaint, answer, proposed settlement agreement, and joint motion for conditional certification of settlement class were all filed on same day). "By specifying certification for settlement purposes only . . . the court preserves the defendant's ability to contest certification should the settlement fall apart." G.M. Trucks, 55 F.3d at 786.

As stated in Amchem, "all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes" as a means to facilitate the settlement of complex nationwide class actions.

34

521 U.S. at 618 (stating also that "[a]mong current applications of Rule 23(b)(3), the 'settlement only' class has become a stock device").  However, drawing, <u>inter</u> <u>alia</u>, on Judge Becker's comprehensive opinions in <u>G.M. Trucks</u> and <u>Georgine v. Amchem Prods., Inc.</u>, 83 F.3d 610 (3d Cir. 1996), the Supreme Court noted the special problems encountered with settlement classes.  See <u>Amchem</u>, 521 U.S. at 621-23; <u>see also</u>, <u>G.M.Trucks</u>, 55 F.3d at 795 (stating that "collusion, inadequate prosecution, and attorney inexperience are the paramount concerns in precertification settlements").  Nonetheless, the <u>Amchem</u> Court held that certification of classes for settlement purposes only was consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the -- proposal is that there be no trial.  But other specifications of the Rule those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context.  Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

521 U.S. at 620.

The Court made clear that the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e) does not relieve the court of its responsibility to evaluate Rule 23(a) and (b) considerations. "Federal courts . . . lack authority to substitute for Rule 23's certification criteria a standard never adopted--that if a settlement is 'fair,' then certification is proper." 521 U.S. at 622.  Indeed,

> [t]he safeguards provided by the Rule 23(a)

35

and (b) class-qualifying criteria, we emphasize, are not impractical impediments -- checks shorn of utility -- in the settlement-class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind -- class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer. . . .

Id. at 621. Thus, regardless of whether a district court certifies a class for trial or for settlement, it must first find that the class satisfies all the requirements of Rule 23. Id.; G.M. Trucks, 55 F.3d at 799-800 ("In sum, 'a class is a class is a class,' and a settlement class, if it is to qualify under Rule 23, must meet all of its requirements.").

In making this analysis, the district court may take the terms of the proposed settlement into consideration. The central inquiry, however, is the adequacy of representation. In re Prudential, 148 F.3d at 308. Thus, "[s]ubdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." Amchem, 521 U.S. at 621.

1. Certification Process Followed by the District Court

Our review of the record makes plain that the District Court did not engage in the Rule 23(a) and (b) inquiry required by Amchem. The July 17, 2003 Order, which conditionally

certified the class for settlement purposes, explicitly left the Rule 23 analysis for the November 14, 2003 fairness hearing. Review of the transcript of the fairness hearing reveals no instance where the District Court discussed the issue of certification. Finally, the District Court's December 4, 2003 Final Order Approving Class Action Settlement states only that "[t]he Class this court preliminarily certified is finally certified for settlement purposes under Fed. R. Civ. P. 23(a), (b)(3), and (c)(2) because the court finds that the Class fully satisfies all the applicable requirements of Fed. R. Civ. P. 23 and due process." JA 159. The Court's ipse dixit statement was not accompanied by any discernable analysis.

Appellees direct us to the Proposed Findings of Fact and Conclusions of Law submitted by the settling parties, which do provide a detailed Rule 23 analysis. Although the District Court did not sign them, it adopted them wholesale by way of a footnote in its December 4, 2003 Memorandum accompanying the Final Order approving settlement. In this footnote, the Court stated that

> Subsequent to the hearing, class counsel submitted proposed findings of fact and conclusions [of law]. . . . Upon independent review of the record in this case, the court finds that the proposed findings and conclusions are fully supported by the record adopted by the court and incorporated into this memorandum by reference as if fully set forth.

JA at 176.

We are bound by the Supreme Court's decision in Anderson v. Bessemer City, 470 U.S. 564, 572 (1985), holding that a district court's verbatim adoption of a party's proposed findings of fact and conclusions of law, although highly disapproved of, is not per se grounds for reversal. Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1215-16 (3d Cir. 1993). However, there must be evidence in the record demonstrating that the district court exercised "independent judgment" in adopting a party's proposed findings. Bright v. Westmoreland County, 380 F.3d 729, 731-32 (3d Cir.

37

2004); see also Pa. Envtl. Def. Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 233 (3d Cir. 1998) ("The central issue is whether the district court has made an independent judgment.").

In the present case, the only evidence we find in the record that the District Court exercised independent judgment is the fact that it said it did. JA at 176 ("Upon independent review of the record in this case. . . ."). Indeed, when questioned at oral argument, Appellees were unable to point to any additional record evidence to support a finding of independent judgment.

By contrast, there is substantial basis in the record to question whether "independent judgment" was exercised. As detailed above, see JA at 1973-74, during a closed door session held before the November 14, 2003 fairness hearing, the District Court asked the settling parties to submit the proposed findings of fact and conclusions of law, which it "would adopt basically." Cf. Anderson, 470 U.S. at 572-73 (holding that district court's findings should receive no less deferential review when district court announced its decision to parties first and then asked prevailing party to prepare findings of fact, many of which it ultimately adopted verbatim). At the actual fairness hearing, class certification itself was never discussed.

We also note that nearly every order issued by the District Court in this case was a verbatim copy of a proposed order offered by the settling parties. See, e.g., July 17, 2003 Order conditionally certifying class for settlement purposes; October 14, 2003 Order invalidating class opt-outs and restricting communications between Appellants and class; November 10, 2003 Order quashing Appellants request for discovery; December 4, 2003 Proposed Findings of Fact and Conclusions of Law. We are therefore concerned that the District Court may have abdicated its role as a neutral and independent adjudicator or, at the very least, sacrificed independent judgment for administrative efficiency.

We are confident that the district judge sincerely concluded that he had exercised the required "independent judgment." Statements of subjective conclusions, however, are

38

insufficient when adopting verbatim suggested findings of fact and conclusions of law to meet the strict requirements of Rule 23. What is required at a minimum is a statement of reasons, expressed in objective form, how the court exercised independent judgment in evaluating the submissions of counsel.

In the context of meeting the requirements of Rule 23 (a) and (b), we are not satisfied that the bare statement that the "proposed findings and conclusions are fully supported in the record" meets the minimum standard of accepting verbatim adoption as contemplated in the teachings of Anderson, 470 U.S. at 572. We believe that a court must set forth persuasive reasons, stated with objectivity, why the submissions of counsel totally reflect the independent judgment of the court. The act of accepting as its own these critical suggestions is an important judicial conclusion whose acceptability is merited only to the extent that sound reason stated publicly supports the acceptance.[13]

Because we are not convinced that the District Court exercised "independent judgment" in adopting the proposed findings of the settling parties, we conclude that the settlement-only class was never properly certified in accordance with Amchem. "[W]ithout certification there is no class action, and in a settlement entered without class certification the judgment will not have res judicata effect on the claims of absent class members." G.M. Trucks, 55 F.3d at 800 (internal citation, quotations, and alterations omitted). We will therefore vacate the settlement Order and remand to the District Court.

2. The Appropriateness of Class Certification

---

[13] Judge Aldisert notes that we find instruction in the words of Justice Felix Frankfurter: "[F]ragile as reason is and limited as law is as the expression of the institutionalized medium of reason, that's all we have standing between us and the tyranny of mere will and the cruelty of unbridled, undisciplined feeling." Remarks on his retirement after 23 years on the Supreme Court, as quoted in Time Magazine, Sept. 7, 1962 at 15.

Our conclusion that the settlement class was not properly certified does not mean that the class could not be certified on remand. Because we believe certification may indeed be appropriate, we examine some of the relevant factors to be considered on remand.

We have stated that "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." G.M. Trucks, 55 F.3d at 799. To be certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). If the Rule 23(a) requirements are met, the court must then find that the class fits within one of the three categories of class actions set forth in Fed. R. Civ. P. 23(b).[14] In the present case, the parties chose to pursue a class action under Rule 23(b)(3), the customary vehicle for damage actions.[15] Thus, the District Court

_____

[14] Rule 23(b)(1) authorizes certification in cases where separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," Rule 23(b)(1)(A), or would "as a practical matter be dispositive of the interest" of nonparty class members "or substantially impair or impede their ability to protect their interests." Rule 23(b)(1)(B). Rule 23(b)(2) authorizes class actions seeking declaratory or injunctive relief, and is used, for example, in civil rights cases alleging class-based discrimination.

[15] Rule 23(b)(3) provides:

(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The

40

must determine that common questions of law or fact predominate and that the class action mechanism is the superior method for adjudicating the case. "The requirements of subsections (a) and (b) are designed to insure that a proposed class has 'sufficient unity so that absent class members can fairly be bound by decisions of class representatives.'" In re Prudential, 148 F.3d at 309 (quoting Amchem, 521 U.S. at 621); see also Hassine v. Jeffes, 846 F.2d 169, 176 n.4 (3d Cir. 1988) ("'[C]ommonality, like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff. . . .") (citation omitted). A court must determine class certification independently from its Rule 23(e) inquiry into the fairness of the proposed settlement.[16] Amchem, 521 U.S. at 621.

i. The Rule 23(a) Criteria

There is no dispute that the conditionally certified class meets the numerosity and commonality prongs of Rule 23(a). See generally In re Prudential, 148 F.3d at 309. The class consists of approximately 44,000 members and "the named

---

matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

[16] Rule 23(e) provides:

The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class . . . [and] must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.

Fed. R. Civ. P. 23(e)(1)(A), (B).

41

plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

We likewise find that the requirements of typicality are met. "The concepts of commonality and typicality are broadly defined and tend to merge." Baby Neal, 43 F.3d at 56. Both concepts seek to ensure that the interests of the absentees will be adequately represented by the named plaintiffs. Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 157 n.13 (1982). However, "neither of these requirements mandates that all putative class members share identical claims." Baby Neal, 43 F.3d at 56; see also Hassine, 846 F.2d at 176-77; Weiss v. York Hosp., 745 F.2d 786, 809 (3d Cir. 1984). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Baby Neal, 43 F.3d at 58.

The mere fact that some members of the class may have additional state or federal law claims, not asserted by the named plaintiffs, does not preclude a finding of typicality. Because the claims of all class members here depend upon the existence of the Shumway scheme, "their interests are sufficiently aligned [such] that the class representatives can be expected to adequately pursue the interests of the absentee class members." In re Prudential, 148 F.3d at 312 (citing Amchem, 521 U.S. at 621); see also Baby Neal, 43 F.3d at 58 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.").

Having determined that the numerosity, typically, and commonality prongs are met, we turn to the issue of the adequacy of class representation. See generally Amchem, 521 U.S. at 625. This requirement encompasses two distinct inquiries designed to protect the interests of absentee class members: "it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the

42

qualifications of the counsel to represent the class." G. M. Trucks, 55 F.3d at 800.

In considering the first inquiry, we must examine Appellants' allegations that many members of the class, including some named plaintiffs, have colorable claims under, inter alia, TILA and HOEPA[17] that were not asserted by class counsel either in the complaint or during negotiations of settlement.

TILA is a federal consumer protection statute, intended to promote the informed use of credit by requiring certain uniform disclosures from creditors. The statute is implemented by Regulation Z, 12 C.F.R. §§ 226.1 et seq., which was promulgated by the Board of Governors of the Federal Reserve System under the mandate of 15 U.S.C. § 1607. Among other things, creditors who make loans secured by a borrower's principal dwelling are required to provide all borrowers with "material disclosures," including "the annual percentage rate, the finance charge, the amount financed, the total payments, [and] the payment schedule." 12 C.F.R. § 226.23. If "material disclosures" are not provided or inaccurately provided,[18] the creditor is strictly liable and a borrower has the right to rescind the loan up to "3 years after consummation, upon transfer of all of the consumer's interest in the property, [or] upon sale of the property, whichever occurs first." Id.[19] In addition to the right

_____

[17]Appellants also allege that members of the class have claims under various state law consumer protection statutes. For purposes of our Rule 23(a) analysis, it is not necessary to delve into the viability of such claims.

[18]15 U.S.C. § 1606(c) provides a safe harbor for APR overstatements of .125%.

[19] Consumers also have the unqualified right to rescind a credit transaction (in which a security interest is retained in their principal dwelling) within three business days following the consummation of the transaction or the delivery of the information about the right to rescind and rescission forms required by TILA

43

of rescission, an aggrieved borrower may, within one year of the date of the violation, seek "actual damage[s] sustained . . . as a result of the failure,"[20] and statutory damages, which cannot exceed $500,000 or one percent of the creditor's net worth (whichever is less) in the case of a class action. 15 U.S.C. §§ 1640(a)(1), (2)(B).[21]

HOEPA, enacted as an amendment to TILA, creates a special class of regulated loans that are made at higher interest rates or with excessive costs and fees.[22]  These loans are not only

---

together with a statement containing the material disclosures required by TILA, whichever is later.

[20] The TILA provision governing actual damages reads, in part:

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person in an amount equal to . . .
> (1) any actual damage sustained by such person as a result of the failure; . . . .

15 U.S.C. § 1640(a)(1).  Several courts have held that detrimental reliance is an element of establishing actual damages under TILA. See, e.g., Turner v. Beneficial Corp., 242 F.3d 1023, 1028 (11th Cir. 2001) (en banc); Perrone v. Gen. Motors Acceptance Corp., 232 F.3d 433, 436-40 (5th Cir. 2000).  We have not had the opportunity to examine this issue.

[21] TILA also provides for attorney's fees and costs.  15 U.S.C. § 1640(a)(3).

[22] Specifically, HOEPA protections apply if a loan meets one of two high-cost loan triggers: (1) the annual percentage rate ("APR") exceeds by eight percent the yield on Treasury securities of comparable maturity for first-lien loans, or above ten percent for subordinate-lien loans; or (2) the total of all the loan's points and

subject to the restriction on terms commonly used by predatory lenders to manipulate the cost of the loans, but are also subject to special disclosure requirements. See 15 U.S.C. § 1639. Within three business days prior to the consummation of a loan, a creditor is required to disclose to the borrower, inter alia, the APR of the loan and the amount of regular monthly payments. 15 U.S.C. §§ 1639 (a)(2), (b)(1). Failure to materially comply with such requirements entitles a borrower to "an amount equal to the sum of all finance charges and fees paid by the consumer. . . ." Id. at § 1640(a)(4). Voluntary assignees of a credit obligation are liable for TILA or HOEPA violations by the original creditor where the violation is apparent on the face of the disclosure statement. Id. at § 1641(a).

An affirmative action under HOEPA must be brought within one year of the violation, id. at § 1640(e), and an action for rescission must be brought within three years, 12 C.F.R. § 226.23. However, these provisions are subject to equitable tolling. See Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 504 (3d Cir. 1998); cf. Mullinax v. Radian Guar. Inc., 199 F. Supp. 2d 311, 328 (M.D.N.C. 2002). No statute of limitations applies to a borrower asserting a violation of TILA or HOEPA as a defense (by recoupment or set-off) in a foreclosure action. Id. at § 1640(e).

Appellants contend that many class members have colorable HOEPA and TILA claims because defendants materially understated the APR in many of the class members' TILA disclosures. More particularly, the Appellants note that the calculation of APR must incorporate "finance charges," as defined in Regulation Z, 12 C.F.R. § 226.4. Although title fees are ordinarily excluded from the definition of "finance charges," 12 C.F.R. § 226.4(c)(7), and therefore not incorporated into the APR, Appellants contend that the title fees in the present case are bogus because they were directly passed to the Shumway

fees exceed eight percent of the loan total or $400 (adjusted for inflation), whichever is greater. 15 U.S.C. §§ 1602(aa)(1), (3); 12 C.F.R. §§ 226.32(a)(1)(i), (ii).

Organization. They contend that failure to incorporate these title fees into the APR calculation resulted in materially understated APR disclosures. Appellants thus urge that defendants' potential TILA and HOEPA liability averages $20,108.76 per borrower for the nationwide class, an amount far greater than the $250 to $925 that each class member would receive pursuant to the settlement.

Although class counsel do not challenge the substance of Appellants' above arguments, they do assert that the decision not to pursue TILA and HOEPA claims was reasonable because (1) most members of the putative class had executed HOEPA disclosure forms; (2) many class members' claims have lapsed due to HOEPA's one-year statute of limitations on affirmative claims; (3) TILA or HOEPA claims could not be certified as a class action because prosecution would involve substantial individual inquiries; and (4) establishing actual damages would be difficult because several courts have held that detrimental reliance is an element in a TILA claim for actual damages.

The District Court, on analysis, may find that these ex post rationales are not compelling. First, the TILA provisions make plain that regardless of whether a signed HOEPA acknowledgment is provided, strict liability is imposed on lenders and on their assignees if the APR of a loan is materially misstated in the TILA disclosure forms. 15 U.S.C. §§ 1639(a)(2)(A), 1641(d). Second, although it may be true that the one-year statute of limitations on affirmative TILA and HOEPA claims has lapsed for an appreciable number of class members, the relevant statutory period for claims of rescission is three years, and no limitations period applies for defensive claims for recoupment or setoff in a foreclosure action. Moreover, Appellees themselves submit that approximately 14,000 members of the class have loans that have closed "within one year of the date of filing of the relevant complaint," see JA 1984. Thus, it appears that one-third of the class may have affirmative TILA and HOEPA claims that are not time barred.

Third, class counsel provide no persuasive support for the proposition that TILA and HOEPA claims cannot be asserted as

part of a class action, or at the very least incorporated into the negotiations of a settlement. Indeed, 15 U.S.C. § 1640(a)(2)(B) explicitly contemplates the possibility of a class action suit. Id. Although the calculation of individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate. See, e.g., In re Visa Check / MasterMoney Antitrust Litig., 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir. 2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"). This is especially true where "the fact of injury and damage break down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation. . . ." Windham v. Am. Brands, Inc., 565 F.2d 59, 68 (4th Cir. 1977) (en banc) (internal citations and quotations omitted). Whether an individual borrower has a viable TILA or HOEPA claim may be determinable by conducting simple arithmetic computations on certain figures obtained from the face of each loan's TILA Disclosure Statement.

Finally, class counsel's argument that assessing actual damages would be difficult in the class action context, because several courts have held that detrimental reliance is an element of establishing such damages under TILA, see, e.g., Turner v. Beneficial Corp., 242 F.3d 1023, 1028 (11th Cir. 2001) (en banc); Perrone v. Gen. Motors Acceptance Corp., 232 F.3d 433, 436-40 (5th Cir. 2000), is not persuasive. As stated above, it is undisputed that TILA subjects creditors to strict liability for claims of rescission. See, e.g., Schnall v. Amboy Nat'l Bank, 279 F.3d 205, 217 (3d Cir. 2002) ("This Court has squarely held that reliance is not an element of a cause of action [for reasons] under TILA."); In re Porter, 961 F.2d 1066, 1078 (3d Cir. 1992) ("TILA achieves its remedial goals by a system of strict liability . . . .").

Even if this court were to adopt the holdings of <u>Turner</u> and <u>Perrone</u> in actual damages cases (an issue we need not decide here), it does not necessarily follow that this "highly individualized inquiry . . . likely would have precluded . . . class certification" under Rule 23(b)(3). Appellees' Br. at 31-32. The existence of an individual inquiry does not preclude class action treatment where all class members face the necessity of proving the same fraudulent scheme. <u>See, e.g.</u>, <u>Amchem</u>, 521 U.S. at 625 (stating that even though mass accident cases are likely to present significant individual questions of liability and damages, such cases "may, depending upon the circumstances, satisfy the predominance requirement"). <u>In re Sch. Asbestos Litig.</u>, 789 F.2d 996, 1010 (3d Cir. 1986). This is even more true in a settlement-only class action, where the court certifying the class need not examine issues of manageability. <u>Amchem</u>, 520 U.S. at 620.

All of the above, of course, are issues to be considered by the District Court in its independent analysis. Because we do not have before us its analysis of the viability of the TILA and HOEPA claims, we will not pretermit its decision. We merely conclude that Appellants' arguments merit more attention than they were given by the District Court as reflected in the record.

If the Court determines that the TILA and HOEPA claims are viable, there may be serious questions whether the named plaintiffs' interests are sufficiently aligned with those of absent class members as required by Rule 23(a). The age of the named plaintiffs' loans when the relevant complaints were filed ranged from twenty-eight months (in the case of Mathis) to fifty-six months (in the case of Davis).[23] JA at 497. Because the one-year statutory period for filing an affirmative TILA or HOEPA claim has lapsed for all named plaintiffs, the named plaintiffs appear to have no incentive to maximize such claims for the approximately 14,000 class members who may still retain this valuable cause of

---

[23] The average age of the named parties' loans at the time the relevant complaint was filed was forty-nine and one-half months. JA at 497.

48

action.  Furthermore, we also note that of the named plaintiffs, only Mathis' loan was made within the three-year period for TILA rescission claims.  Our concern that the value of potential TILA and HOEPA rescission claims is not adequately represented by the named plaintiffs is heightened by the fact that the settlement only differentiates between class members who have loans that are less than one-year old and class members who have loans that are older than one year.[24]  See generally G.M. Trucks, 55 F.3d at 801 (providing that intra-class conflict can sometimes be discerned from "the very terms of the settlement").

Although we recognize that "adequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of the claim," Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 113 (2d Cir. 2005), we are not convinced based on the present record that the named plaintiffs adequately represent the interests of the entire class.  At the very least, consideration should have been given to the feasibility of dividing the class into sub-classes so that a court examining the proposed settlement could have judged the fairness of the settlement as it applied to similarly situated class members.  See G.M. Trucks, 55 F.3d at 801.

Our concern with class counsel's representation extends to their negotiation of the settlement.  "Courts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."  G.M. Trucks, 55 F.3d at 801.  We find no reason to doubt that class counsel are sufficiently experienced to represent the class, but we are stymied in analyzing the second and third prongs of the criteria.  In G.M. Trucks, we stated that these "points require attention in view of the lack of significant discovery and the extremely expedited settlement of questionable value accompanied by an enormous legal fee."  Id.

---

[24]Class members who have loans less than one-year old are given a higher settlement amount.

Class counsel admitted during oral argument that no formal discovery was conducted whatsoever—either in <u>Kessler</u> or in any of the five consolidated actions. While Appellees submit that formal discovery was not necessary because of the sufficiency of "informal discovery obtained by Class Counsel from witnesses and former employees," Appellees' Br. at 27, "we are loathe to place . . . dispositive weight on the parties' self-serving remarks." <u>G.M. Trucks</u>, 55 F.3d at 804. Without adequate exploration of the absent class members' potential claims, it is questionable whether class counsel could have negotiated in their best interests.

There is also some question whether the absent class members' interests were sufficiently pursued by class counsel. We have already noted that class counsel never asserted colorable TILA and HOEPA claims. However, those claims were part of the settlement release. Failure to pursue such claims may suggest that class counsel subrogated their duty to the class in favor of the enormous class-action fee offered by defendants.

Finally, we cannot avoid consideration of the issue of potential collusion. This court, as well as others, have commented extensively on the collusive dangers inherent in a settlement-only class action. <u>See, e.g.</u>, <u>G.M. Trucks</u>, 594 F.2d at 1124; John C. Coffee, Jr., <u>Class Wars: The Dilemma of the Mass Tort Class Action</u>, 95 Colum. L. Rev. 1343, 1370-73 (1995); Samuel Issacharoff, <u>Governance and Legitimacy in the Law of Class Action</u>, 1999 Sup. Ct. Rev. 337, 388 (1999). The United States Court of Appeals for the Seventh Circuit has noted the possibility that

> the settlement agreement is the product of a "reverse auction," the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement within the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.

<u>Reynolds v. Beneficial Nat'l Bank</u>, 288 F.3d 277, 282-83 (7th

50

Cir. 2002); see also Blyden v. Mancusi, 186 F.3d 252, 270 n.9 (2d Cir. 1999). Yet another court of appeals has noted that in a settlement-only action, class counsel "might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991); see also Mars Steel Corp. v. Con'l Ill. Nat'l Bank and Trust Co., 834 F.2d 677, 680-81 (7th Cir. 1987).

As we recognized in Prandini v. Nat'l Tea Co., 557 F.2d 1015, 1021 (3d Cir. 1977), there exists a special danger of collusiveness when the attorney fees, ostensibly stemming from a separate agreement, were negotiated simultaneously with the settlement. See also G.M. Trucks, 55 F.3d at 803; Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 238, 266 (1985). Aside from class counsels' own assertions that fees were discussed after negotiations of the settlement had concluded, JA at 1383 (Declaration of Carlson), no other record evidence supports such an assertion. Furthermore, "even if counsel did not discuss fees until after they reached a settlement agreement, [such a fact] would not allay our concern since the Task Force recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement." G.M. Trucks, 55 F.3d 804.[25]

We emphasize, as we stated above, that we do not preclude the possibility that the adequacy of class representation can be established on a more developed record. The District Court is instructed to examine carefully this matter on remand.

_____

[25] We recognize that Evans v. Jeff D., 475 U.S. 717, 734-38 (1986), overruled Prandini's strict rule prohibiting simultaneous negotiations, but as stated in G.M. Trucks, "many of the concerns that motivated the Prandini rule remain, and we see no reason why Jeff D. or its underlying policy of avoiding rules that impede settlement preclude us from considering the timing of fee negotiations as a factor in our review of the adequacy of the class's representation." 55 F.3d at 804.

ii. The Rule 23(b)(3) Criteria

To meet the requirements of Fed. R. Civ. P. 23(b)(3), the District Court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation. Amchem, 521 U.S. at 623-24. A proper predominance inquiry "trains on the legal or factual questions that qualify each member's case as a genuine controversy, questions that preexist any settlement." 521 U.S. at 623. In this vein, a predominance analysis "is similar to the requirement of Rule 23(a)(3) that claims or defenses of the named representatives must be 'typical of the claims of defenses of the class.'" Id. at 623 n.18 (quoting Diamond v. Charles, 476 U.S. 54, 76-77 (1986) (O'Connor, J., concurring in part and concurring in judgment)). Just as the record below supports a finding of typicality, it also supports a finding of predominance. All plaintiffs' claims arise from the same alleged fraudulent scheme. The presence of potential state law or federal claims that were not asserted by the named plaintiffs does not defeat a finding of predominance. See In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986) (affirming class certification based on credible "showing, which apparently satisfied the district court, that class certification [did] not present insuperable obstacles" relating to variances in state law).

The superiority requirement asks a district court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997). Fed. R. Civ. P. 23(b)(3) instructs that the matters pertinent to this inquiry include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the

52

class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

Id. We find no reason, and Appellants fail to offer any, why a Rule 23(b)(3) class action is not the superior means to adjudicate this matter.

The record before us reflects a small number of individual suits against defendants arising from the Shumway scheme, indicating a lack of interest in individual prosecution. In re Prudential, 148 F.3d at 316. The presence of certain class members with significant individual HOEPA claims may counsel against a finding of superiority, but these individuals can opt-out and pursue their claims individually. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004). If a substantial number of such individuals remain in the class, the use of subclasses may be appropriate. See generally In re Prudential, 148 F.3d at 316 n.58. Finally, the fact that certain class members may have separate claims resulting in manageability problems does not change the result. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620 (internal citations and quotations omitted).

iii. Summary of Rule 23 Analysis

We therefore conclude preliminarily based on the record before us that all of the requirements of Fed. R. Civ. P. 23(a) can be met with the exception of the adequacy of representation, which requires additional analysis. On remand, the District Court should pay particular attention to the prevalence of colorable TILA, HOEPA, and other claims that the individual class members may have which were not asserted by class counsel in the consolidated complaint (or presumably in settlement negotiations). Finally, if the District Court were to find that class certification is appropriate, the Court should determine whether subclasses are necessary or appropriate based

53

on the above findings.

B.  The District Court's Orders Invalidating Opt-Outs

Appellants challenge the District Court's October 14, 2003 Order invalidating all solicited opt-out requests, directing the Settlement Administrator to mail curative notices to members of the class who opted-out, and barring Appellant law firms from communicating with members of the class unless they first submitted their proposed communications to the Court for approval.  We review this Order for an abuse of discretion. Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).

Because the advantage of class action litigation comes at the cost of binding absent class members through the res judicata effect of litigation over which they lack control, the district courts must closely monitor the notice process and take steps to safeguard class members from "unauthorized [and] misleading communications from the parties or their counsel."  Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980). District courts have "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." Gulf Oil, 452 U.S. at 100.  Rule 23(d) provides: "In the conduct of actions to which this rule applied, the court may make appropriate orders: . . . (3) imposing conditions on the representative parties or on intervenors . . . [and] (5) dealing with similar procedural matters."  Fed. R. Civ. P. 23(d).

However, a remedy should be restricted to the minimum necessary to correct the effects of improper conduct under Rule 23.  Coles v. Marsh, 560 F.2d 186, 189 (3d Cir. 1977).  The Supreme Court made clear in Gulf Oil that:

> [A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties . . . .  Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the

54

Federal Rules of Civil Procedure, especially Rule 23 . . . . In addition, such a weighing -- identifying the potential abuses being addressed -- should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

452 U.S. at 101-102; see also Coles, 560 F.2d at 189 ("[T]o the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened. Moreover, the district court must find that the showing provides a satisfactory basis for relief and that the relief sought would be consistent with the policies of Rule 23 giving explicit consideration to the narrowest possible relief which would protect the respective parties.").

The district court in Georgine v. Amchem Prods., Inc., 160 F.R.D. 478 (E.D. Pa. 1995), faced a factual situation similar to the one that faces us. Several law firms sent misleading solicitations to members of the potential settlement class, urging them to opt-out or to object to the fairness of a proposed settlement. By the opt-out date, approximately 201,654 exclusion requests were filed. After extensive factual findings, the court determined that the solicitations by outside counsel contained misstatements, "likely confused and misled class members, caused a high number of opt-outs, and therefore, had an adverse effect on the administration of justice." 160 F.R.D. at 498. The court's fashioned remedy was to invalidate all opt-out requests, provide curative notice to those who had opted-out, and establish a second opt-out period. Id. at 502. It reasoned that such action was justified under both the court's authority to govern class action proceedings under Fed. R. Civ. P. 23(d) and the requirement that it ensure that all class members receive the "best notice practicable" under Fed. R. Civ. P. 23(c).

Similar action has been taken by other courts. See In re Fed. Skywalk Cases, 97 F.R.D. 370, 374 (W.D. Mo. 1983); Impervious Paint Indus., Inc. v. Ashland Oil, 508 F. Supp. 720,

722 (D. Ky. 1981); see also David F. Herr, Manual for Complex Litigation § 21.33 (4th ed.) ("Objectors to a class settlement or their attorneys may not communicate misleading or inaccurate statements to class members about the terms of a settlement to induce them to file objections or to opt out. If improper communications occur, curative action might be necessary, such as extending deadlines for opting out . . . or voiding improperly solicited opt outs and providing a new opportunity to opt out.").

The District Court in this case had similar authority over the class action settlement process. Misleading communications by soliciting counsel have a detrimental effect on the class notice procedure and, therefore, on the fair administration of justice. See generally Greenfield v. Villager Indus., Inc., 483 F.2d 824, 831-32 (3d Cir. 1973) (stating that class action procedure "which has a formidable, if not irretrievable, effect on substantive rights, can comport with constitutional standards of due process only if . . . the 'best notice practicable under the circumstances including individual notice. . . '" is given); Impervious Paint Ind., 508 F. Supp. at 723 ("It is essential that the class members' decision to participate or to withdraw be made on the basis of independent analysis of [their] own self-interest.").[26]

---

[26] While it may be true that outside counsel play an important role in helping absent class members evaluate the decision of whether to opt-out of the settlement class, see, e.g., David F. Herr, Manual for Complex Litigation § 21.311 (4th ed.) (providing in standard notice form that class members could either retain their own lawyers or contact class counsel for advice); Fed. R. Civ. P. 23(c)(2)(B) (stating that "[f]or any class certified under Rule 23(b)(3), the court must direct to class member the best notice practicable under the circumstances, including . . . notice . . . that a class member may enter an appearance through counsel if the member so desires"), it would be disingenuous to suggest that outside counsel act solely from a desire to serve class members' interests. Simply put, those law firms have a pecuniary interest in soliciting opt-outs or objectors; the greater number of opt-outs or objectors, the less likely the proposed settlement will survive, and the more likely that the law firms will have the opportunity to bring

56

However, the District Court never specified which portions of the solicitation letters were objectionable. Gulf Oil, 452 U.S. at 102. It conducted no evidentiary hearing, set no briefing schedule, and gave Appellants no practicable opportunity to be heard.[27] The October 14, 2003 Order provided only that: "[f]or good cause, the Court invalidates and declares void all solicited opt-outs by class members from Georgia, Missouri, Illinois, Maryland, Florida and Alabama." JA at 143. The District Court did not state what such "good cause" was.

As noted earlier, the District Court simply used verbatim the proposed Order provided by the settling parties. This ran afoul of the Gulf Oil holding requiring specification and articulated weighing of the relevant factors to ensure that the chosen remedy be restricted to the minimum necessary to correct the alleged misconduct. Because the District Court did not follow the requirements of Gulf Oil, we cannot sustain the portions of the October 14, 2003 Order invalidating the opt-outs or the October 17, 2003 Order declining to revisit the earlier Order. On remand, the District Court should reexamine the solicitation letters, specify the misleading statements (if any) makes specific findings of fact with respect thereto and, after hearing from both class counsel and Appellants' counsel, fashion a new notice to the class members whose opt-outs were cancelled, explaining the situation and giving them a new opportunity to opt-out.

Furthermore, it is imperative that we comment on the broad and sweeping nature of the District Court's ban on communications from Appellants' counsel.[28] As noted in Gulf

their own suits in search of lucrative attorney fees.

[27]Appellees filed their joint motion with the District Court on October 6, 2003. The Court granted the joint motion on October 14, 2003 (the day following the Columbus Day holiday).

[28] Because of the broad scope of the Order, some of the Appellant law firms were precluded from communicating with clients who had retained them before the first opt-out period and

Oil, such restrictions involve "serious restraints on expression" and therefore, "at [a] minimum, counsels caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses." 452 U.S. at 104. Even in Georgine, where the district court made detailed findings of misleading statements and particularly disruptive behavior by outside counsel, the court's imposed remedy was merely the invalidation of the first set of opt-outs, the establishment of a second opt-out period, and the mailing of a curative notice. No communication restrictions were imposed, and the court expressly rejected defendants' request for an order requiring future communications between outside counsel and class members to include a statement disclosing the lawyers' financial interest in convincing the class members to opt-out. 160 F.R.D. at 517. Notwithstanding our comment in note 26, supra, that the pecuniary interests of outside counsel warrant special review of their communications to members of the class, we do not suggest that a prior restraint on communications is at all proper. Indeed, the "best notice" provision in Rule 23(c)(2)(B)[29] affords class members the right to contact their own attorneys to determine whether joining a proposed class-

---

whom they represented in pending litigation. Also pertinent is the fact that Legg submitted a proposed communication to the District Court on October 16, 2003. The Court, apparently grouping it together with the other Appellant law firms' motions to reconsider, denied it without discussion or reference in its October 17, 2003 Order.

[29] Rule 23(c)(2)(B) states that:

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances. . . . The notice must concisely and clearly state in plain, easily understood language . . . that a class member may enter an appearance through counsel if the member so desires [and] . . . that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded.

wide settlement is in their best interests.  Cf. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811 (1985).

Further, the District Court's October 17, 2003 Order which denied the Appellant law firms' motion to reconsider the October 14, 2003 Order stated:

> The letters mailed by each of the firms named in the October 14, 2003 Order of Court to plaintiff class members in this case were direct solicitations for prospective clients whom they knew to be represented by another lawyer.  If there is not a rule of professional conduct that prohibits such activity in the jurisdictions where these lawyers practice, there should be.  See generally Georgine v. Amchem Products, 160 F.R.D. 478 [, 495 n.26] (E.D. Pa. 1995). . . .

JA at 145.

The district court in Georgine suggested, without holding, that outside counsel who had communicated with class members who were not their clients "may have violated their ethical duty to refrain from communicating about the substance of the settlement with class members represented by another lawyer." 160 F.R.D. at 495 n.26.  However, courts have recognized that class counsel do not possess a traditional attorney-client relationship with absent class members.  See Cobell v. Norton, 212 F.R.D. 14, 17 (D. D.C. 2002); cf. Greenfield, 483 F.2d at 832 (providing that class counsel has "fiduciary" relationship with absent class members); In re Shell Oil Refinery, 152 F.R.D. 526, 528 (E.D. La. 1989) (stating that "constructive" attorney-client relationship exists once opt-out period has closed).  As stated in In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1239 (N.D. Cal. 2000),

> While lead counsel owes a generalized duty to unnamed class members, the existence of such a fiduciary duty does not create an inviolate attorney-client relationship with each and every member of the putative class.  Taken to an extreme, lead plaintiff's logic suggests that putative class members are forever walled off from any effort at solicitation, a proposition

59

that seems unsupportable.

Id. at 1245; see also Morisky v. Pub. Serv. Elec. & Gas Co. 191
F.R.D. 419, 424 (D. N.J. 2000) (providing that class counsel
could not assert attorney-client privilege over questionnaires
completed by putative class members); 5 Alba Conte & Herbert
B. Newberg, Newberg on Class Actions § 15:16 (4th ed. 2002)
(stating that once opt-out period ends "[t]he attorneys for the
class have assumed fiduciary obligations or constructive
attorney-client status with respect to the class").

We have already noted that Fed. R. Civ. P. 23(c)(2)(B)
explicitly provides "that a class member may enter an
appearance through counsel if the member so desires."  Indeed,
the original notice to the class informed class members that they
could "discuss [the proposed settlement] with your own attorney
or appear through your own attorney."  JA at 360 (emphasis
omitted). To accept the District Court's determination that a
communication between outside counsel and an absent class
member would be a violation of an attorney's ethical duty would
essentially eviscerate this right.[30]

---

[30] To be sure, there is a distinction between the unilateral
action of a class member who seeks the advice of outside counsel,
often his or her prior counsel, and the unsolicited communications
from outside counsel designed to disrupt a proposed settlement.
However, the Supreme Court, as well as this court, has commented
on the importance of ensuring that class members make an
informed decision whether to remain in a prospective class.  See
generally Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 549
(1974); In re Cendant Corp. Litig., 264 F.3d 201, 252 (3d Cir.
2001).

We also emphasize that we do not condone misleading
solicitation letters.  We are not free to bar wholesale solicitation
letters in light of the Supreme Court's decisions. See Fla. Bar v.
Went For It, Inc., 515 U.S. 618 (1995); Bates v. State Bar of Ariz.,
433 U.S. 350 (1977).  However, if the District Court finds that all
or some of the letters sent in this case were materially misleading,

C.  The Motions to Intervene

Appellants contend that the District Court erred by denying their motions to intervene as matter of right under Fed. R. Civ. Pr. 24(a)(2) or, in the alternative, permissibly under Fed. R. Civ. P. 24(b)(2).  2 Herbert B. Newberg, Newberg on Class Actions § 11:56 (2d ed. 1985).

It is axiomatic that to intervene as a matter right under Rule 24(a)(2) the prospective intervenor must establish that: "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation."  Harris v. Pernsley, 820 F.2d 592, 596 (3d Cir. 1987).  In the class action context, the second and third prongs of the Rule 24(a)(2) inquiry are satisfied by the very nature of Rule 23 representative litigation.  Therefore, when absent class members seek intervention as a matter of right, the gravamen of a court's analysis must be on the timeliness of the motion to intervene and on the adequacy of representation.

Timeliness of an intervention request "is determined by the totality of the circumstances."  United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1181 (3d Cir. 1994).  Among the factors to be considered are:  (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay.  Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 369 (3d Cir. 1995).  In the present case, members of the nationwide class first learned of the proposed settlement in early August 2003 when they received the Notice of Class Action Settlement. Although silent on the issue of intervention, the Notice provided that all opt-out elections must be received by October 1, 2003.  The time frame in which a class member may file a motion to intervene challenging the adequacy of class representation must be at least as long as the time in which s/he may opt-out of the class.  We

_____

it is free to so hold and, among other things, censure those responsible.

61

recognized in McKowan Lowe & Co. v. Jasmine, Ltd., 295 F.3d 380 (3d Cir. 2002), that:

> Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case.

295 F. 3d at 384 (internal citation and quotations omitted); cf. Graham C. Lilly, Modeling Class Actions: The Representative Suit as an Analytic Tool, 81 Neb. L. Rev. 1008, 1035 (2003). We therefore conclude that because Appellants' motion to intervene filed on October 1, 2003 was within the opt-out period, it was presumptively timely. Although the District Court concluded that granting the motion to intervene would "likely delay the proceeding to the prejudice of the Class," JA at 146, this conclusion was unaccompanied by any reasoning or discussion. The motion to intervene was filed six weeks before the date scheduled for the fairness hearing and the District Court did not explain why permitting intervention at that juncture of the proceedings would have resulted in prejudice.

In Virginia v. Westinghouse Elec. Corp., 542 F.2d 214 (4th Cir. 1976), the court stated that, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented . . . ." 542 F.2d at 216. To overcome the presumption of adequate representation, the proposed intervenor must ordinarily demonstrate adversity of interest, collusion, or nonfeasance on the part of a party to the suit. See, e.g., Int'l Tank Terminals, Ltd. v. M/V Acadia Forest, 579 F.2d 964, 967 (5th Cir. 1978).

Unlike the situation of an ordinary class action where the district court, as part of the class certification procedure, will have undertaken an independent inquiry into the adequacy of the named parties' and class counsel's representation, Fed. R. Civ. P. 23(a)(4); Amchem, 521 U.S. at 626, in a settlement-only class

62

action the district court will often merely "conditionally" certify the class. Thus, when Appellants here filed their first motion to intervene on October 1, 2003, the District Court was faced with the issue of class counsel's adequacy of representation and possible collusion as matters of first impression. The October 21, 2003 Order denying intervention merely stated without any accompanying reasoning that "the proposed intervenors/objectors have not presented any evidence to support their contention that the Settlement at issue is collusive or that Class Counsel are inadequate . . . ." JA at 146. We are certainly not in a position to characterize the settlement as collusive, but for the reasons set forth above, the circumstances of the present case require closer scrutiny by the District Court than it appears to have given. Class counsel failed to assert, inter alia, what appear to be facially viable TILA and HOEPA claims, conducted no formal discovery, and negotiated an extremely generous fee. On remand the District Court should consider, based on a full record, whether Appellants have met their burden of showing collusion warranting granting of Appellants' motion to intervene.[31]

To be clear, we are in no way suggesting that absent class members who merely express dissatisfaction with specific aspects of the proposed settlement or that attorneys (who, after finding one or more class members as clients, and wish to share in the forthcoming fee), have the right to intervene. The goals of Rule 23 would be seriously hampered if that were permitted. See Am. Pipe and Constr. Co. v. Utah, 414 U.S. 538, 551 (1974) (stating that filing of individual motions to join or to intervene was "precisely the multiplicity of activity which Rule 23 was designed to avoid"); In re Prudential, 148 F.3d at 313.

D.  Appellants' Request for Discovery

Appellant Walters challenges the District Court's

---

[31] In light of our above decision to remand on the question of intervention as a matter of right, we need not discuss the alternative argument regarding permissive intervention.

November 10, 2003 Order limiting discovery as an abuse of discretion. Specifically, this Order provided that "the Missouri and Illinois Objectors, their attorneys, and any person acting on their behalf may not issue any further discovery requests or subpoenas" without prior approval of the Court; that Appellants may not present testimony of any witness at the final fairness hearing without prior approval of the Court; and that all prior subpoenas purporting to require a witness or party to attend and testify at the final fairness hearing were void. JA at 151.

We consider Walters' challenge in light of our precedent that holds objectors are "entitled to an opportunity to develop a record in support of [their] contentions by means of cross examination and argument to the court." Greenfield v. Villager Indus., Inc., 483 F.2d 824, 833 (3d Cir. 1973); see also Grimes v. Vitalink Communications Corp., 17 F.3d 1553, 1558 (3d Cir. 1994) ("[T]he objecting class members must be given an opportunity to address the court as to the reasons the proposed settlement is unfair or inadequate."); Fed. R. Civ. P. 23(c)(2)(B) ("[A] class member may enter an appearance through counsel if the member so desires."). In Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), we reversed the district court's final approval of a class action settlement and remanded for clarification of the record, noting, inter alia, that the "objector . . . was not afforded an adequate opportunity to test by discovery the strengths and weaknesses of the proposed settlement." Id. at 157. Although we found that the objector was "entitled to at least a reasonable opportunity to discovery" against the plaintiffs and defendants, that finding was predicated on the total inadequacy of the record upon which the settlement was approved and the "totality of the circumstances surrounding the settlement hearing" in which the objector was denied meaningful participation. Id. We therefore conclude that Girsh cannot stand for the proposition that, as a general matter, objectors have an absolute right to discovery. See, e.g., In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 24 (D. D.C. 2001).

On the other hand, we recognized that discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made

64

available to objectors. See Girsh, 521 F.2d at 157; see also In re Prudential, 148 F.3d at 325 (holding that district court acted within its discretion by limiting discovery requests of objectors because objectors had ample opportunity to avail themselves of substantial discovery provided to lead counsel but failed to do so).

The District Court has discretion to "employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement." In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F.Supp. 450, 563 (D. N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998); 2 Herbert B. Newberg, Newberg on Class Actions § 11:56 (2d ed. 1985) ("The criteria relevant to the court's decision of whether or not to permit discovery are the nature and amount of previous discovery, reasonable basis for the evidentiary requests, and number and interests of objectors.").

In the present case, it is undisputed that no formal discovery was undertaken by class counsel. However, Appellant Walters has litigated, albeit unsuccessfully, two suits involving the same fraudulent scheme in the state courts of Missouri. See supra at Part I.D. It is likely that Walters has developed sufficient facts regarding this matter and its prospective settlement value such that it would be able to present a cogent and supportable objection at the fairness hearing. See Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314-15 (3d Cir. 1993).

Walters asserts that the District Court hampered its attempts at seeking discovery related to a settlement in a related case, Dundon v. FirstPlus Bank, No. 01-408-GPM (S.D. Ill.), which would have demonstrated that the settlement in the present case was inadequate. The settling parties contend that although the Dundon suit was brought by two of the attorneys who represent plaintiffs in the present case, the case is irrelevant to the fairness of the present settlement because it involved different parties, claims, and a different procedural posture.

We are inclined to agree with the settling parties that the District Court's Order limiting discovery was not an abuse of

65

discretion, but we are unable to conclusively so hold. The record before us contains no details of the <u>Dundon</u> matter, aside from the parties' unsupported assertions.[32]

Finally, we note that the District Court's November 10, 2003 Order was issued only four days prior to the fairness hearing. The Order, albeit purporting to permit discovery requests, in all practical respects barred discovery altogether because those requests were to have been submitted first to the Court for approval. On remand, the District Court is instructed to develop fully the record and reevaluate whether an order limiting discovery is appropriate in light of its duty to "employ

---

[32] Appellant Walters has filed a motion to supplement the record, pursuant to Rule 10(e) of the Federal Rules of Appellate Procedure, to include pleadings, legal memoranda, and testimony from <u>Dundon</u>, and other proceedings wholly separate from the present litigation. We will deny this motion.

This court has made clear that the "[t]he only proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court." <u>Fasset v. Delta Kappa Epsilon</u>, 807 F.2d 1150, 1165 (3d Cir. 1986); <u>see also</u> <u>Sewak v. Immigration & Naturalization Serv.</u>, 900 F.2d 667, 673 (3d Cir.1990) ("As an appellate court we do not take testimony, hear evidence or determine disputed facts in the first instance. Instead, we rely upon a record developed in those fora that do take evidence and find facts."). Although we have acknowledged that in exceptional cases, the court may have inherent power to allow a party to supplement the record on appeal, <u>see</u> <u>In re Capital Cities/ABC Inc.'s Application for Access to Sealed Transcripts</u>, 913 F.2d 89, 97 (3d Cir. 1990) (listing number of factors court should consider: "(1) whether the proffered addition would establish beyond any doubt the proper resolution of the pending issue; (2) whether remanding the case to the district court for consideration of the additional material would be contrary to the interests of justice and the efficient use of judicial resources; and (3) whether the appeal arose in the context of a <u>habeas</u> <u>corpus</u> action"), such circumstances are absent from the present case.

the procedures that it perceives will best permit it to evaluate the fairness of the settlement." In re Prudential, 962 F. Supp. at 563.

E.  The Fairness of the Settlement

We restate for purposes of this section the terms of the settlement, approved by the District Court in its December 4, 2003 Final Order Approving the Class Action Settlement.  Under the settlement, the defendants are to pay up to $33 million to the 44,535 member class, with awards to the class members ranging from $250.00 to $925.00, contingent on when the loan closed, and the borrower's state of residence when the loan closed.  The first factor reflects the RESPA one-year statute of limitations; class members who closed their loans within one year of the earliest-filed relevant complaint[33] are entitled to higher payments than class members whose loans closed before that date.  The second factor provides higher payments to class members who reside in one of twenty-one "qualifying states," where class counsel determined that class members theoretically could have pursued state-law claims against defendants.[34]  The settlement also would award approximately $ 8.1 million in fees to class counsel, with defendants bearing the costs of settlement administration.  JA 322, 321.

In exchange, participating class members were to release any and all claims against defendants which were, or could have been, asserted in the litigation.  These include potential TILA, HOEPA, and various state law claims that were never pled in any of the six original complaints or in the consolidated complaint.

---

[33] The relevant complaint is Davis for the CBNV borrowers and Ulrich for the GNBT borrowers.

[34] The "qualifying states" are: Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Missouri, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Washington, Wisconsin, and Wyoming. Virginia is a "qualifying state" with respect to GNBT borrowers.

67

Appellants urge us to find that the District Court abused its discretion when it approved the settlement as fair, reasonable, and adequate.[35] See Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975). Given our disposition of the various issues explored above, we find it unnecessary and imprudent to address definitively the substantive nature of the settlement.

In Part III.A, we determined that the District Court failed to certify properly the settlement-only class, as required by Amchem, and we noted that the current record is inadequate to support the District Court's finding as to the adequacy of class counsel's representation of all members of the class. We remand so that the District Court can make adequate findings under Rule 23(a) and (b)(3), supplementing the record if necessary.

We further determined in Part III.B that the District Court's Order (which invalidated the first set of opt-outs, directed curative notices, and restricted Appellant law firms' communications with absent class members) ran afoul of the Supreme Court's holding in Gulf Oil. As a result, we directed the District Court on remand to make specific factual findings justifying the need for remedial action, which may include invalidation of the first set of opt-outs. If a remedy is deemed necessary, the District Court must carefully tailor the remedy to Appellants' specific misconduct. Significantly, the 435 class members who will be given the opportunity to reinstate their initial opt-out decisions comprise nearly 1% of the total class—a figure nearly double the .5% trigger that would allow defendants to rescind the settlement offer. Thus, a significant possibility exists, on remand, that if class members choose to re-opt-out in the same numbers, defendants may terminate the settlement offer or materially alter its terms.

---

[35] To support this contention, Appellant Nix has filed a motion to supplement the record on appeal with two exhibits consisting of a spreadsheet and graph depicting all Georgia loans originated and recorded monthly by CBNV and GNBT during the period from September 1, 1997 to July 31, 2004. For the reasons given in note 30, supra, we will deny this motion.

We do feel obliged, however, to comment on the procedural posture surrounding the settlement proceedings. In class actions, particularly settlement-only suits, the district court has a duty "to protect the members of a class . . . from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class." Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279 (7th Cir. 2002). We have gone so far as to deem the district judge a "fiduciary" of the class. In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001); see also Culver v. City of Milwaukee, 277 F.3d 908, 915 (7th Cir. 2002); G.M. Trucks, 55 F.3d at 806 (providing that district courts have "heightened duty to scrutinize [a] pre-certification settlement"); Grant v. Bethlehem Steel Corp., 823 F.2d 20, 22 (2d Cir. 1987). We have declined to explore whether the settlement is substantively fair (for the reasons enunciated above), leaving that to the District Court in the first instance, but there is little in the record to give us confidence that the District Court exercised its fiduciary duty to assure that the settlement process was procedurally fair.

We find very little, if any, evidence in the record that the District Court gave the settlement and its unique characteristics the careful and comprehensive scrutiny required under the circumstances. First, virtually every order issued by the District Court was a verbatim or near verbatim copy of a proposed order offered by the settling parties.[36] Particularly troubling are the circumstances surrounding the District Court's verbatim adoption of the settling parties' proposed Findings of Fact and Conclusions of Law into the December 4, 2003 Final Order Approving the Class Action Settlement. The District Court entrusted class counsel to prepare these findings in an ex parte

---

[36] See, e.g., July 17, 2003 Order conditionally certifying the class for settlement purposes; October 14, 2003 Order invalidating class opt-outs and restricting communications between Appellant's and the class; November 10, 2003 Order quashing Appellant's request for discovery; December 4, 2003 Proposed Findings of Fact and Conclusions of Law.

closed door session held <u>before</u> the settlement hearing, when counsel for Appellants were not present. The colloquy between class counsel and the Court, block quoted in Part I, not only reflects the District Court's failure to inquire into any substantive aspect of the settlement, but also suggests that the fairness hearing was a mere formality. It suggests that the District Court had pre-determined its approval of the settlement before hearing the arguments of any of the five objectors.

Further, we find that the District Court's own Memorandum accompanying the December 4, 2003 Order (among the few documents drafted by the Court itself), reflects poorly on the Court's familiarity with the facts and substantive nature of the case before it. The first two sentences of the Memorandum state that: "This is a complex commercial fraud case. Plaintiffs, on behalf of themselves and all others similarly situated, allege in their consolidated amended complaint that defendants . . . acted in violation of . . . [HOEPA, RESPA, and RICO] . . . , as well as related state laws." JA at 174. Not only is this consumer fraud case (not a commercial case), but more importantly, the gravamen of the Appellants' objections to the fairness of the settlement, and an undisputed fact reflected in the Consolidated Amended Complaint, <u>see</u> App at 637-711, is that class counsel did not assert or seek remuneration for potentially valuable HOEPA and TILA claims. This is the lynchpin of Appellants' arguments that class counsel was not adequately representing the interests of absent class members. With this misunderstanding of the case before it, it is difficult to ascertain how the Court was able to fulfill its duty to scrutinize rigorously the fairness of the settlement. <u>See</u> <u>G.M. Trucks</u>, 55 F.3d at 805 ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified.").

F.  <u>The Petition for Mandamus</u>

On May 10, 2005 Appellants filed a motion, pursuant to 28 U.S.C. § 2106, for reassignment to a different district court judge, any matters remanded to the district court as part of the relief awarded in the present appeal. Due to the nature of the motion, it has been docketed and will be construed as a petition

for mandamus.

> 28 U.S.C. § 455 provides that:
>
> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) [The judge] shall also disqualify himself in the following circumstances:
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings. . . .

Id.

Beliefs or opinions which merit recusal generally must stem from an extrajudicial source. Liteky v. United States, 510 U.S. 540, 554 (1994). Because the focus is on the source of the judge's views and actions, "judicial rulings alone almost never constitute a valid basis for bias or partiality motion." Id. at 555 (citing United States v. Grinnell Corp., 384 U.S. 563, 583 (1966)). Similarly, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id.

Section 455(a) mandates an objective rather than a subjective inquiry. See United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994) ("'The judge does not have to be subjectively biased or prejudiced, so long as he appears to be so.'") (quoting Liteky, 510 U.S. at 553 n.2); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 162 (3d Cir. 1993) ("'[T]he public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted', requires that 'justice must satisfy the appearance of justice.'") (quoting In re Sch. Asbestos Litig., 977 F.2d 764, 776 (3d Cir. 1992)). Therefore, "if a 'reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality' under the applicable standard, then the judge must recuse." United States v. Antar, 53 F.3d 568,

71

574 (3d Cir. 1995) (quoting In re Larson, 43 F.3d 410, 415 (8th Cir. 1994)).

Appellants make no allegation that the District Court derived its alleged bias from an extrajudicial source; rather all incidents cited in Appellants' motion refer to rulings or statements made by the District Court during the course of the proceedings. We find that, notwithstanding our ruling that the District Court abused its discretion in various aspects of its management of this class action, Appellants have not demonstrated that the Court exercised "such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky, 510 U.S. at 555. We will therefore deny Appellants' petition for a writ of mandamus.[37]

## IV.
## CONCLUSION

For the reasons set forth above, we will remand the case to the District Court for further proceedings consistent with this opinion.

_____

---

[37] We note as well that the District Court was besieged by opposing groups of lawyers who flooded it with numerous motions, arguments, and counter-arguments, which undoubtedly made it difficult for the Court to engage in the reflection needed to exercise its fiduciary duty to assure that the settlement process was procedurally fair. We have seen with dismay that some, if not many, of the attorneys on both sides of what has become the class action industry have, "in derogation of their professional and fiduciary obligations, placed their pecuniary self-interest ahead of that of the class." Reynolds, 288 F.3d at 279. We believe it is the responsibility of counsel, consistent with their obligations to their clients, to assist the district courts in their difficult tasks of managing often unwielding class actions by eliminating unnecessary motions, exercising restraint in filing objections, and treating opposing counsel with the civility that should characterize attorney relations.